## *In re* NOSEK'S ESTATE.

### PLUNKETT *v.* NOSEK.

1. WILLS—UNDUE INFLUENCE—OPPORTUNITY ALONE INSUFFICIENT.
   Proof of opportunity to exercise undue influence alone cannot give rise to a valid inference that undue influence was exercised.[1]

2. SAME—EVIDENCE—SUFFICIENCY—PRESUMPTION REBUTTED.
   In a will contest case, evidence *held*, insufficient to show the exercise of any undue influence, and if any presumption of its exercise arose under the circumstances shown it was rebutted by proponents' uncontradicted testimony.[2]

3. SAME—STATUTE DOES NOT REQUIRE THAT TESTATOR SIGN IN PRESENCE OF ATTESTING WITNESSES.
   The trial judge was in error in instructing the jury that the statute relative to the execution of wills (3 Comp. Laws 1915, § 11821) requires that the person making the will sign the same in the presence of the attesting witnesses.[3]

4. SAME—OBSERVANCE OF FORMALITIES REQUIRED BY LAW.
   Where the attorney wno drew the will and also signed it as an attesting witness testified consistently and positively to the full observance of the various formalities required by law, the trial judge was in error in submitting said question to the jury, although the testimony of one of the attesting witnesses was in certain respects conflicting and confused as to whether the testatrix signed in witness' presence and whether the witness was told by the testatrix that the instrument witnessed was her will.[4]

---

[1]Wills, 40 Cyc. p. 1145; [2]Id., 40 Cyc. p. 1165; [3]Id., 40 Cyc. p. 1120; [4]Id., 40 Cyc. p. 1322.

On necessity that witnesses to will see testator sign, or that they see his signature, see notes in 38 L. R. A. (N. S.) 161; L. R. A. 1915B, 87.

Error to Wayne; Dingeman (Harry J.), J. Submitted April 25, 1924.    (Docket No. 79.)    Decided January 28, 1925.

Julia Plunkett and others presented for probate the last will of Frances (Fanny) Nosek, deceased.    The will was allowed in the probate court, and Mabel Nosek and another appealed to the circuit court.    Judgment for contestants, proponents bring error.    Reversed, and judgment ordered entered for proponents.

*Alexander M. Rea,* for appellants.

*Corliss, Leete & Moody* (*Thomas T. Leete, Jr.,* of counsel), for appellees.

STEERE, J.    This proceeding involves a contest over the will of Frances (or Fanny) Nosek who died at her home in Detroit on January 27, 1920, at the age of about 86 years, leaving a last will and testament dated June 19, 1913.    Her estate consisted of real and personal property valued at over $30,000.    Appellants are her surviving daughters and sons, Julia Plunkett, Mary Benwig, Edward and Joseph Nosek.    When the case was tried Julia was 61 years old, Mary 58, Edward 53 and Joseph, her youngest child, was 42 or 43 years.    Appellees, Mabel and Frances Nosek, are testator's granddaughters, women approaching middel age and children of her deceased son, Emil Nosek, who, if living at the time of the trial, would have been 65 years of age.    The parties to this litigation are all who would have been her legal heirs had testatrix died intestate.    All are beneficiaries under her will, appellees being left $500 each and the balance of her estate is divided among her sons and daughters except $200 left to her son-in-law, Herman Benwig, "for the kindness he had shown to my husband and myself."    Claiming that they should have their "one-fifth" as representatives of their de-

ceased father, the granddaughters contested the will on the ground that it was not executed in conformity with formalities required by statute and deceased was unduly influenced in the disposition of her estate by the other beneficiaries.    At the close of the proofs appellants' counsel moved for a directed verdict in their behalf on the ground there was no competent testimony to carry either issue to the jury.    This was refused and the court submitted both questions to the jury under a lengthy charge with instructions to answer the following special question: "Was the will executed according to the formalities required by law?"    To this the jury returned the answer "No" in connection with their general verdict "in favor of the contestants and against the proponents."    Motion for judgment *non obstante* was duly made for appellants and denied, followed by a motion for a new trial on various grounds, including the claim that the verdict was against the great preponderance of evidence, which was also denied.    Judgment was entered on the verdict May 29, 1923.

The will was prepared by John C. Tobias, an attorney of Detroit, who was well acquainted with deceased and had served the family from time to time in his professional capacity for many years.    It was admittedly signed by deceased, is in regular form with proper attestation clause reading as follows:

"Signed, sealed, published and declared by the said Fanny Nosek as and for her last will and testament in the presence of us who, at her request and in her presence and in the presence of each other, have subscribed our names as witnesses thereto.
(Signed) "Mrs. J. E. STUBENSKY,
258 Maybury,
"JOHN EDWARD STUBENSKY,
258 Maybury Grand Avenue,
"JOHN C. TOBIAS,
58 Cadillac Square,
Detroit, Michigan."

Testatrix and her husband, Joseph Nosek, had spent most of their long married life in Detroit. Just when they came there or when they were married is not clearly shown. It is indicated they came from Germany. Their second daughter, Mrs. Benwig, testified that she was 58 years old and born in Detroit. It was shown that her mother spoke English, German and Bohemian. Joseph Nosek, testatrix's husband, was in the grocery and saloon business in Detroit for many years, with the saloon or bar in a room back of his grocery and the family living in rooms above. He prospered until the panic of 1893 but, as a result of it, became financially embarrassed to an extent that he soon thereafter failed in business and lost all his accumulations, leaving the family in comparatively straitened circumstances for several years entirely dependent for support on his wages as a night watchman and earnings of the children yet living at home.

While he was yet in business and about the time of his financial reverses he and his son Emil had a serious quarrel in which the latter loudly denounced and disowned his father and mother, and became entirely estranged from the rest of the family. His father had helped him to a better education than the other children received and at the time he quarreled with his father he was a married man living near by in a house of his own with his wife and children, the two contestants here, who were then respectively about four and five years of age. Shortly thereafter he moved with his family from the vicinity of his parents to a distant part of the city. The estrangement continued until his death in 1894, when the whole family attended his funeral and manifested themselves as friendly to his wife and contestants, but for some 17 years thereafter the latter kept apart from the rest of the members of the family and did not visit their grandparents though living in the same

city, until their grandfather was in a hospital for a serious operation at an advanced age they visited him and were kindly received by him and their grandmother. They thereafter occasionally called upon their grandparents during the remainder of their lives and were friendly with the other members of the family when they met.

Testatrix's husband never fully recovered from bladder trouble for which he underwent an operation, when over 80 years old, and was an invalid thereafter until his death, on May 19, 1913, when 86 years of age, leaving a will and some estate, how much and who were the beneficiaries is not shown. Some years after her husband's failure in business testatrix inherited certain property in Detroit from a relative, including a modest house on Maybury avenue into which the family moved and where the parents thereafter resided as long as they lived. During the later years of their life the family at home consisted of testatrix and her husband, their son Edward, by trade a machinist and tool maker, who never married and always lived with his parents, weekly paying his mother for his board as long as she lived, and an incompetent sister of testatrix whom she cared for.

Aside from Emil, who drew away under the circumstances stated, it is shown that the family relations of the parents with their children while at home and later were pleasant and congenial. In 1910 a place adjoining theirs was for sale and the old people persuaded Mrs. Benwig and her husband, Herman, to purchase it and live there to be near them, which they did. Herman, who is the first mentioned in the will, was a conductor on the Michigan Central railroad and stated he had known his father-in-law, whom he called a "grand man," for between 40 and 50 years. He was very attentive to him after the latter became an invalid, often acting as a nurse for him.

When testatrix's husband died in 1913 their real estate stood in their joint names as husband and wife by entireties, and she became the sole owner. She was then less than 80 years old, in good mental and physical condition for her age, except some lameness from rheumatism, yet able to care for and manage her household affairs. Dr. McEwen, who attended her husband and had known her since 1899, testified that her mentality was good, she was perfectly capable of following instructions as to the care of her husband and, as he knew her, was "a quiet, reserved woman, not demonstrative in any way, but tender to her husband, * * * could say that she was a woman who could not be influenced against her own wishes. She was a quiet, sensible woman in my judgment." It was shown that after her husband's death she attended to much of her housework for two or three years, and to some extent thereafter, handling her own money and directing her household affairs until shortly before her death. On June 19, 1913, just a month after her husband died, she told her daughter, Mrs. Benwig, who lived next door, to call up Mr. Tobias and tell him she wished to see him, that she wanted to make her will and to find out when he would come up. This Mrs. Benwig did by telephoning from her own house, and Tobias replied he would be up that evening. Tobias testified that he went to testatrix's home that evening and she came to the door when he knocked, conducted him to the sitting room where they sat down with no one else present and she told him what she desired, giving him directions as to how she wanted to make her will. After receiving her instructions he went over to a table and drew up the will in his own handwriting. It is a plain and concise instrument of five short paragraphs occupying, aside from the attesting clause, a single page of the printed record. He then went over it with her and she told him it was as she wanted it to be. No one

else was in the room during that time and, after she had expressed herself as satisfied, he told her they must have witnesses to the will. She then called her daughter, Mrs. Benwig, and sent her to get the witnesses, and she obtained Mr. and Mrs. Stubensky, who then lived just across the street. On their arrival the will was duly executed in conformance with the provisions in the attesting clause, which he read to them in the presence of Mrs. Nosek. She then signed the will and the others present signed as witnesses in the order their names appear in the instrument; that no one else was in the room but testatrix and the three witnesses, unless Mrs. Benwig was there which he did not recall.

Testatrix's mental capacity is not questioned and contestant's substantive evidence claimed to show undue influence consists in the main of proof of opportunity, which alone cannot give rise to a valid inference that undue influence was exercised (*In re Cochrane's Estate*, 211 Mich. 370). Testatrix's unimpaired and independent mentality then and later was testified to by seven witnesses, three apparently disinterested, and met by no denying testimony. We find no evidence in this record that any of her children ever spoke to her or she to them about the disposition of her estate, or of her making a will, until she told Mrs. Benwig to call Mr. Tobias to come up to her house for that purpose, and they all positively deny ever talking with her on the subject before the will was made. Their counsel stress as evidence of undue influence contestants' testimony that in an interview with Tobias he told them in substance that Mrs. Benwig gave him directions as to how to draw the will of which he made a memorandum and drew the will accordingly. Tobias denied ever making any such statement and both he and Mrs. Benwig positively deny the fact. A similar claim was disposed

of adverse to contestants' contention in *Re Cochrane's Estate, supra,* in part as follows:

"We need not determine whether the facts of the instant case bring it within that line of cases where a beneficiary draws the will and where a presumption of undue influence arises because if such presumption exists, it is a rebuttable one. *Bush* v. *Delano,* 113 Mich. 321; *In re Bailey's Estate,* 186 Mich. 677; and in the instant case the denial of undue influence is direct, positive and credible and is undisputed by any evidence, direct or circumstantial. * * *

"When this *prima facie* case, this presumption, was met and challenged by the rebutting evidence, the presumption failed and could not be weighed against the evidence. The contestant's case being then stripped of the presumption, there was nothing left of it for the jury to consider."

The jury rendered a general verdict in favor of contestants theoretically disposing of both issues submitted to them. To what extent they considered the question of undue influence is a matter of conjecture, but their negative answer to the special question of whether the will was executed according to formalities required by law would alone necessitate the verdict rendered.

Our statutory provision relative to executing wills (3 Comp. Laws 1915, § 11821) provides, as applicable here, that to be valid the will shall—

"be in writing, and signed by the testator * * * and attested and subscribed in the presence of the testator by two or more competent witnesses; and if the witnesses are competent at the time of attesting the execution of the will, their subsequent incompetency, from whatever cause it may arise, shall not prevent the probate and allowance of the will, if it be otherwise satisfactorily proved."

Before the will was offered for probate, John G. Stubensky died. Mrs. Stubensky and Tobias, the other attesting witnesses, were sworn and testified as to the execution of the will. Though forgetful as to some

other particulars, Tobias testified consistently and positively as to full observance of the various formalities required by law. Mrs. Stubensky's testimony was in some particulars wavering, uncertain and in part self-contradictory. She told consistently on direct and cross-examination of Mrs. Benwig asking her and her husband if they would go over and sign as witnesses of her mother's will and of their doing so, recognized the attesting clause as having been then read to them by Tobias in Mrs. Nosek's presence, and identified their signatures to it, said they were signed in testatrix's presence and in the presence of each other; but in certain respects her testimony was conflicting and confused. On direct-examination she testified that when they entered the room Mrs. Nosek sat at a table, greeted them and said the paper she asked them to sign was her will, that she saw Mrs. Nosek sign it after which she, her husband and Tobias signed. On cross-examination she testified that she knew it was a will because Mrs. Benwig asked them if they would mind coming over and signing her mother's will, and further answered in part as follows:

"*Q.* That is the way you knew it was a will you were witnessing?

"*A.* Yes.

"*Q.* Nobody else told you it was a will?

"*A.* No.

"*Q.* Then the only thing you knew is when Mrs. Benwig came to you——

"*A.* That is all.

"*Q.* She asked you to sign——witness her mother's will?

"*A.* Yes.

"*Q.* The mother didn't ask you to sign any will, did she?

"*A.* No.

"*Q.* She did not ask you to witness any will?

"*A.* I presume she knew I was going to witness it.

"*Q.* I don't want your presumption.

"*A.* That is all I can tell you.

"*Q.* There was nothing said by the testatrix as to—

"*A.* No.

"*Q.* What it was?

"*A.* No.

"*Q.* You simply assume that it was a will because Mrs.—

"*A.* Because they said it was a will.

"*Q.* That is the daughter that told you?

"*A.* Yes, sir.  *  *  *

"*Q.* Was Mrs. Nosek's name already on the will when you signed it?

"*A.* Yes, sir.

"*Q.* You saw Mrs. Nosek's name on the paper when you signed it?

"*A.* Yes, sir.

"*Q.* They had signed before you got there?

"*A.* They had.   I presume so.

"*Q.* You did not see her sign it?

"*A.* Well, somebody was before us.

"*Q.* But you did not see Mrs. Nosek sign the will?

"*A.* Yes.   As we came in she was the first to sign the will.  *  *  *

"*Q.* Do you remember testifying down in the probate court?

"*A.* Yes, sir.

"*Q.* Do you remember this question being asked you and your making this answer: '*Q.* Didn't you see Mrs. Nosek sign there, make that signature? *A.* Well, I may have, Mr. Tobias, but as I said, I did not retain the memory of it.'

"*A.* Well, I have tried and tried since, and I do remember it."

Further portions of her cross-examination were similarly wavering and unsatisfactory.

In his charge the court instructed the jury:

"It is necessary in order to make a valid will that the person making the will shall sign the same in the presence of at least two witnesses, and that the witnesses shall sign their names in the presence of the testator and in the presence of each other.   If these formalities were not observed in the making of the

will offered for probate in this case, then there is no will.

"If the jury believe that the paper offered as the will of Frances Nosek was signed by her before the witness, Mrs. Stubensky, came into the room, or that the testatrix did not declare the same to be her will, and made no statements to that effect in the presence of the witness, Mrs. Stubensky, then I charge you that the will in question was not executed with the formalities required by law, and it is your duty to find a verdict for the contestants that the instrument is not the last will and testament of the deceased.   *   *   *

"The first question then for you to determine, and the burden of proof as to this phase of the case is upon the proponents, is whether or not this will was executed with the formalities required by law, as I have explained them to you.    If you determine that any of these formalities were lacking, there is no will and your verdict will be that the paper writing is not the last will and testament of Frances Nosek.   *   *   *   If you determine that this will— this paper writing—was not executed as required by law, bearing in mind what I have said to you as to the formalities required by the statute, then, gentlemen of the jury, that is the end of this controversy, and your verdict will be for the contestants."

Error is assigned upon various portions of these instructions, which especially stressed to the jury by repetition the importance of literal compliance with all the formalities as strictly stated, without explanation of what has been held a sufficient compliance in various decisions.    While imperative in some jurisdictions and a proper practice generally observed by careful attorneys, our statute does not require that the testator shall subscribe the will in the presence of the attesting witnesses as the court charged must be done. In *Re Kohn's Estate,* 172 Mich. 342, this court held the statute made imperative three things:

"The will must be in writing; it must be signed by the testator (or by some one in his presence acting for him); and two or more competent witnesses must

attest and subscribe as witnesses in the testator's presence.  *   *   *

"Publication of a will, defined as 'the act of making it known, in the presence of witnesses that the instrument to be executed is the last will and testament of the testator,' with the strict observance of specific formalities imperative in many jurisdictions, is not required in this State (citing numerous cases). But in the execution of a will, according to the statutory requirements, the attesting witnesses signing at the request of the testator, should be advised that the instrument to which they subscribed is his will. Execution in substantial compliance with statutory provisions is, in this State, equivalent to publication as treated by text-writers, and is discussed in many published decisions of other States."

In *Re Connery's Estate*, 175 Mich. 544, where the court approved the charge of the trial court that "The due execution of a will may be shown even against the direct testimony of subscribing witnesses," it is said in part:

"It should be borne in mind that it is conceded that the name signed to this will was the genuine signature of the testatrix, and the signatures of the witnesses were admittedly genuine. Both witnesses were examined at great length. One witness testified to a state of facts that would show strict compliance with the statute.  *   *   *

"This court held in *Abbott* v. *Abbott*, 41 Mich. 540, that the probate of a will is not dependent upon the recollection or veracity of a subscribing witness. In the brief of defendant in error in the case cited will be found a collection of authorities to the effect that, if one of the subscribing witnesses testifies that all the statutory formalities were observed, the will may be admitted to probate, even though the other does not remember that they were observed."

In *Re Maresh's Will*, 177 Wis. 194 (187 N. W. 1009), involving the testimony of a subscribing witness to the will possessed of an ambulatory and reversible memory quite analogous to that of Mrs.

Stubensky, the weight of such testimony is illuminatingly discussed and the following conclusions reached:

"So that we must come to the inevitable conclusion that, notwithstanding apparent contradictions in the testimony of Mrs. Protexter, under the circumstances detailed in the evidence, her faltering version, and her unreliable memory cannot withstand the strong presumption of regularity which arises and obtains by reason of the attestation clause, fortified and supported by the oral testimony of the counsel who drafted and directed and was present at the execution of the will."

Appellants' motion for a judgment *non obstante veredicto* should have been granted.

The judgment is reversed, with costs to appellants and the case remanded with direction to enter judgment in their favor.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.