## *In re* LUDERS' ESTATE.

1. WILLS—UNDUE INFLUENCE—FIDUCIARY RELATIONS—BURDEN OF PROOF.

    In proceedings to contest a will on the ground of undue influence, the fact that children of testatrix, who were beneficiaries under the will, did shopping and performed other filial duties for her, did not make them trustees or establish fiduciary relations so as to cast upon them the burden of proof on said issue, but it rested on contestants.

2. SAME—STATEMENTS BY TESTATRIX ADMISSIBLE TO SHOW STATE OF MIND.

    While statements by testatrix are admissible to show the state of her mind, they do not establish the facts stated by her.

3. SAME—STATEMENTS BY TESTATRIX NOT ADMISSIBLE TO ESTABLISH UNDUE INFLUENCE.

    Statements by testatrix that she was not the boss of the home, standing alone, may not be considered on the question of undue influence, but if a case of undue influence is made out by other proof, such statements may be considered as showing the state of her mind.

4. EVIDENCE—CONJECTURE AND SPECULATION.

    Verdicts based on conjecture and speculation may not stand.

5. SAME—ADMISSIONS BY ONE OF SEVERAL NOT ADMISSIBLE.

    Where there are several beneficiaries under a will, an admission by one of them tending to show that there was undue influence exerted in procuring its execution, is inadmissible.

6. WILLS—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

    Evidence of undue influence, *held*, insufficient to carry said question to the jury.

Error to Muskegon; Vanderwerp (John), J. Sub-

[1]Wills, 40 Cyc. pp. 1150, 1153; 28 R. C. L. 144; [2]Id., 40 Cyc. pp. 1157, 1158; [3]Id., 40 Cyc. p. 1159; [4]Evidence, 23 C. J. § 1795; Wills, 40 Cyc. p. 1164; [5]Id., 40 Cyc. p. 1163; [6]Id., 40 Cyc. pp. 1165, 1332.

mitted January 27, 1927.     (Docket No. 96.)     Decided April 1, 1927.

Christopher Luders and others presented for probate the last will of Minnie Luders, deceased. The will was allowed in the probate court, and Amanda Freeman and another appealed to the circuit court. Judgment for proponents *non obstante veredicto*. Contestant Freeman brings error. Affirmed.

*Alexis J. Rogoski* and *R. Glen Dunn,* for appellant.

*Alexander Sutherland,* for appellees.

Testatrix Minnie Luders was the widow of Henry Luders. They were both born in Germany. They had ten children, two boys, Christopher and Harold, and eight girls, Amanda, Augusta, Elizabeth, Minnie, Mary, Ernestine, Theresia, and Emma. Of the boys, Christopher was the older, and of the girls, Amanda was the oldest. Mr. Luders ran a saloon in Muskegon and a bottling works. All of the children, boys and girls, helped him in his business. While he had some misfortunes, he accumulated some personal property, the value of which does not appear, and three pieces of real estate, the value of which, likewise, does not appear, although there is testimony tending to show that they were not of equal value. They were a business property, the homestead where Mr. and Mrs. Luders lived, and a house which they rented. Shortly before his death he had the title to the real estate placed in himself and wife, and after his death the children joined in conveying the personal property to their mother. He died January 12, 1919. The nine children (other than Amanda) all remained in Muskegon, some marrying and establishing homes of their own, some remaining at home with their father and mother. Those who had homes of their own were almost daily visitors at their parents' and fre-

quently took meals there.    They assisted their parents whenever such assistance was requested.    They had some disagreements among themselves, as a family of that size is expected to have, but they averaged up pretty fair.    Amanda some years after her marriage moved away from Muskegon and for a number of years lived in Grand Rapids.    For twelve years she did not visit her parents, and the testimony is convincing that she wrote to one of her sisters that she was ashamed of her parents, had no pleasant recollection of home, and did not care if she never came home again.    The parents learned of this letter; indeed, it would appear that Mr. Luders read it to his wife. She was very much affected and grieved by it and he was both grieved and incensed over it.    However, on learning of her father's death, Amanda came to the funeral, and during the following winter nursed and cared for her mother during a serious illness.    Her children visited their grandparents and there is evidence of genuine affection between the grandparents and them.

On August 28, 1919, Mrs. Luders executed the will in question.    She gave Amanda $10.    She gave the boys the business property.    The homestead was given to Ernestine and Emma, who were then unmarried, and to Theresia who was then married and living at home.    The property which was rented she gave to the other four girls.    The personal property was given to the nine children, other than Amanda.    In her will she stated:

"All of the provisions and bequests contained herein are in accordance with the wishes of my beloved husband, the late Henry Luders, and myself."

At the same time deeds of like effect were prepared and were signed by her.    It is somewhat doubtful if there was a proper delivery in escrow of them.    The papers were prepared by John H. Banninga, a real

estate dealer, who for many years was a neighbor and friend of Mr. Luders, the other witness being Mr. John W. Wilson, now deceased, but then cashier of one of the Muskegon banks, and likewise a friend of the family for many years. The deeds were placed on record after Mrs. Luders' death and some time thereafter Amanda and Elizabeth filed a bill to set them aside. The will was then offered for probate and was contested by them in probate court. It was admitted to probate and Amanda alone appealed. The contest in the circuit court was on the sole grounds of undue influence. Reserving the question of whether a verdict should be directed sustaining the will, under the provisions of the Empson act, this issue was submitted to the jury and the will was set aside. Judgment was entered, however, sustaining the will *non obstante veredicto*.

FELLOWS, J. (*after stating the facts*). There is no claim, and cannot be, that testatrix was mentally incompetent. The testimony without dispute shows her to have been mentally sound. She was well along in years, by reason of which and physical infirmities she remained at home. She grieved very much over the loss of her lifelong companion and was many times in tears. Shopping and such other matters as necessitated going down town or elsewhere were done by her children for her. This did not make them trustees, establish fiduciary relations and cast the burden of proof upon them. There must be something besides the discharge of filial duty before the doctrine of fiduciary relations may be brought into play in will cases and the burden of proof cast upon children who have stayed at home and sustained the burden of care of their parents in their declining years. The burden of proof on the issue of undue influence was on the contestant.

There is nothing in the will itself indicative of un-

due influence.    The only child who was practically cut off had not visited her parents for 12 years although living but 40 miles away.    All the other children who lived in Muskegon and who showed consideration for their parents were given the property, the boys the business property, the three girls who were living at home were given the home property where they lived, and the other four girls who were married and living in their own homes were given the income-producing property, and the personal property went to all of them equally.    What each one received under the will the record does not disclose, but it was doubtless unequal.    But it was the division testatrix made, and which her husband, from whom she acquired the property, requested her to make.    The will itself bears no earmarks of undue influence.

While statements of the deceased were admissible to show the state of her mind, they did not establish the fact stated by her.    *Zibble* v. *Zibble,* 131 Mich. 655; *In re Kennedy's Estate,* 159 Mich. 548 (28 L. R. A. [N. S.] 417, 18 Ann. Cas. 892, 134 Am. St. Rep. 743); *Bush* v. *Delano,* 113 Mich. 321; *In re Walter's Estate,* 224 Mich. 211; *Hamler* v. *Shiawassee Circuit Judge,* 227 Mich. 235.    Therefore, in considering the question of whether contestants made a case for the jury on this issue, testimony of statements made by her in her lifetime that she was not the boss of the home, of which much is made in brief and in argument, may not be considered.    If a case of undue influence was made out by other proof, then such statements could be considered by the jury in determining the state of her mind, but such statements do not establish the facts stated.

While much stress is laid on the testimony of statements of testatrix that she was not boss, it is also insisted that there is ample testimony outside of this to take the case to the jury.    Elizabeth did not join Amanda in the appeal from the probate court but she

was a willing witness in her behalf.    It is her testimony that she relied upon to take the case to the jury. Her testimony tends to show that at one time during the lifetime of their father when she was at outs with Theresia they had some trouble at home and Theresia insisted that Elizabeth must leave or she, Theresia, would, and the father sided with Theresia.    Testatrix, so far as the record discloses, took no part in the difficulties of these sisters.    This incident was unfortunate but it has no bearing on the issue of whether testatrix was unduly influenced.    Christopher was practically a daily visitor at the home of his mother. He and Theresia frequently talked together and the witness says that when she approached them they would cease their conversation, and one or the other would say: "Lizzie is coming," or words of similar purport.    To a "Hawkshaw" or a "Conan Doyle" this might be a suspicious circumstance, but it was not proof.    Once she heard Christopher say, "I don't want it at all."    What he referred to is left to conjecture and speculation, and verdicts based on conjecture and speculation can not stand.    Had Christopher made an admission tending to establish undue influence, it would not have been admissible, there being several other beneficiaries under the will. *Roberts* v. *Bidwell,* 136 Mich. 191; *In re Ganun's Estate,* 174 Mich. 286.    Elizabeth testifies that she was at home the day the will was drawn and was in an adjoining room.    She says her mother was crying when the men came and Theresia told her to stop crying and get those papers so as not to keep the men waiting all the afternoon.    The proof shows that Theresia was in and out of the room where Mr. Banninga and Mr. Wilson were with her mother, and Elizabeth says she heard conversation which she could not distinguish.    We fail to see that this makes a case of undue influence.    All the testimony agrees that testatrix was very much affected by the loss of her

husband and was in tears much of the time.     Mr. Banninga and Mr. Wilson were both busy men and their services to testatrix that day were largely of a friendly nature.

Upon the sole question here involved, *i. e.,* was there sufficient testimony to take the question of undue influence to the jury, our course is pretty well charted by numerous decisions of this court.     We shall consider but few of them.     In the case of *Maynard* v. *Vinton,* 59 Mich. 139 (60 Am. Rep. 276), it was said:

"The influence, to vitiate the will, must have been such as to amount to force and coercion, destroying her free agency,     *     *     *     Neither can it be set aside on the ground of undue influence, unless such influence amounted to a degree of constraint, such as the testatrix was too weak to resist, and such as deprived her of her free agency, and prevented her from doing as she pleased with her property.     Neither advice nor arguments nor persuasion will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion."

While some of the language used by Justice CHAM-PLIN in this case has been disapproved (*Bush* v. *Delano, supra*), the language we have quoted has not been but has frequently been followed and quoted by this court.     In *Re Fay's Estate,* 197 Mich. 675, it was said by Mr. Justice STEERE, speaking for the court:

"Unquestionably undue influence may be shown by indirect and circumstantial evidence, but it must be evidence of probative force beyond mere suspicion, and we do not think it can be fairly said as a matter of law that the incidents urged raise inferences that deceased's free agency was destroyed and he acted under such coercion, compulsion, or constraint that the will did not truly proceed from him according to his wishes, which is the test of undue influence."

Mr. Justice CLARK, speaking for the court in *Re Murray's Estate,* 219 Mich. 70, said:

"We find no evidence that Agnes ever requested testator to leave her his property.     But if it may be

inferred, that she desired his property and that she communicated that desire to him, that does not constitute undue influence."

And in *Pritchard* v. *Hutton,* 187 Mich. 346, it was said:

"This court has often said that the mere fact that a decedent so disposed of his property as to do an apparent injustice to one or more of his relatives would not nullify the transaction. Courts are not permitted to make equitable distribution of estates, but are concerned only in giving effect to the legal acts of decedents."

See, also, *Lamb* v. *Lippincott,* 115 Mich. 611; *In re Bulthuis' Estate,* 232 Mich. 129; *In re Carlson's Estate,* 218 Mich. 262; *In re McIntyre's Estate,* 193 Mich. 257; *In re Weber's Estate,* 201 Mich. 477; *In re Morris' Estate,* 228 Mich. 555; *In re Nosek's Estate,* 229 Mich. 559.

The will in the instant case made an unequal distribution of decedent's property; it did not follow the statutes of descent and distribution; the children living in Muskegon had opportunity to exercise influence both due and undue; there is some interested testimony tending to arouse suspicion. But neither one nor all of these things, under our former holdings, took the question of undue influence to the jury. If the rule were otherwise, the right to make a will disposing of one's property, a sacred right, would hang by a very slender thread. Practically every will which was made the subject of contest would be submitted to a jury, and the right to make a will would no longer rest with the owner of the property but would go to a jury of the vicinage. The trial judge was quite right in directing that judgment be entered sustaining the will.

That judgment will be affirmed.

SHARPE, C. J., and BIRD, SNOW, STEERE, WIEST, CLARK, and McDONALD, JJ., concurred.