*In re* ALVORD'S ESTATE.

1. Wills—Mental Competency.
    In will contest case, testimony *held*, sufficient to show that testatrix was mentally competent to make will.

2. Same—Right of Testatrix to Dispose of Property.
    It was right of mentally competent testatrix to make such disposition of her property as she saw fit, notwithstanding jury or others might have preferred different disposition of it.

3. Same—Right of Elderly People to Make Will.
    Right to make will should be carefully vouchsafed to elderly persons who have testamentary capacity.

4. Same—Undue Influence—Validity of Will.
    Mere opportunity to exercise undue influence, fact that property is not disposed of in manner that judge or jury would prefer, or that beneficiaries appear not to be as deserving of testamentary bounty as others might, do not, of themselves, affect validity of will.

5. Same—Fraud—Duress—Restraint.
    Where testimony showed that testatrix was mentally competent to make will and codicils, and that there was no undue influence, fraud, duress, force, restraint, or misrepresentation practiced on her, judgment *non obstante veredicto* for proponents was properly entered.

Appeal from Genesee; Gadola (Paul V.), J. Submitted April 14, 1932. (Docket No. 109, Calendar No. 36,253.) Decided June 6, 1932.

Jessel Hardy presented the last will of Phebe J. Alvord for probate. On objections of Minnie Dell and others the matter was certified to the circuit court. Judgment *non obstante veredicto* for proponent. Contestants appeal. Affirmed.

*Guy W. Selby,* for proponent.

*Cook, Sheppard & Stipes* and *Alex B. Simonson,* for contestants.

Butzel, J. Phebe J. Alvord was the mother of Artemas, or Art, as he was called, a young son by a previous marriage, when she married Austin G. Alvord, a prominent citizen of Flint. Art was taken into the Alvord home, assumed the surname of Alvord, and was treated as a son by his stepfather. The Alvords had no other children. Mr. Alvord predeceased his wife after .a happy married life of 40 years, or thereabouts. Mrs. Alvord, who inherited all of his property, died on May 6, 1930, leaving what purported to be a last will and codicils, and an estate appraised at $64,000, which included the Alvord Block and other valuable property in Flint. The will, drawn on August 7, 1929, and the codicils, drawn shortly thereafter, provide that $5,000 be placed in trust for the benefit of Jessie Baird, a friend, and be paid to her at the rate of $40 per month, and if any amount of such legacy remain unpaid at the time of her death, it should revert to the estate. There are bequests of $500 to a former servant, $2,000 to a housekeeper, $7,000 to Mrs. Powell, a sister-in-law, and $1,500 to several friends. Mrs. Bess Alvord, a former daughter-in-law, and the divorced wife of Art, is given a specific legacy of $10,000 and the entire residue. The will and codicils were drawn by an able attorney of high standing. 'He first went to Mrs. Alvord's home, where he took notes. She discussed the reasons for including or excluding some of the members of her family. Mrs. Bess Alvord was not present at the time that the will and codicils were drawn. As tes-

tatrix left no immediate family, a brief review of her relations and associations is necessary.

Her entire interest and affection were centered on her son, Art. He was both worthless and shiftless, and addicted to drink. He seldom, if ever, worked and was a source of constant worry and expense to those interested in him. Mrs. Alvord had a favorite niece, Minnie Dell, of Port Huron, Michigan, of whom she had been very fond. Jessie Baird was also an intimate friend of the Alvords. As a young girl, she had lived in the Alvord home for a few years, and Mrs. Alvord always retained her friendship for her. Mrs. Alvord was about 75 years of age when she executed the will in question. In 1925 and 1926, after Mr. Alvord's death, she executed several wills in which Mrs. Dell was left a specific legacy and the residue of the estate in the event that Art, to whom the income from the estate was given for life, should die without leaving issue. In 1920, Art married Bess Schultz, who had been divorced from her former husband after a married life of but a few years. She seemed able to look after Art, and was regarded as a daughter by the testatrix, although at times there was serious friction between them. Bess was not devoid of the frailties of human nature; also, she occupied a very difficult position between a husband addicted to drink on one side and his devoted, loyal, and partial mother on the other. Serious quarrels arose, and at one time Bess was paid a sum in settlement of alimony in a divorce proceeding that was contemplated. She lived out at a lake cottage that had been given to herself and her husband. In order to care for Mrs. Alvord, who had become ill, Bess secured the services of a trained nurse by the name of Jean, who had taken care of Mr. Alvord during his last sickness. When

Jean thus again came to the Alvord home, she very quickly supplanted Bess in Art's affections. Before a year had elapsed, Art secured a divorce from Bess and married Jean. The following year they took a trip to Europe, where he left her and returned home. Jean's return was delayed because she had been born abroad and had not a copy of her husband's birth certificate with her so that she could prove her right of re-entry into the country. Art showed no haste in sending the certificate to her, and upon her return she did not live with him. Bess had meanwhile opened a rooming house in Pontiac, and, at the request and expense of Mrs. Alvord, Art roomed and boarded at Bess' home, where he died suddenly on February 19, 1929. After his death Mrs. Alvord and Bess became more intimate. The old lady's affections remained centered about Art, and it was not unnatural that she should turn to Bess, who had been Art's wife and who had taken or assumed the place of a daughter. Mrs. Alvord did not like Jean, who had lived with Art but a short time.

Upon Mrs. Alvord's death the will and codicils were offered for probate. Mrs. Dell and two nephews filed objections, claiming mental incompetence on the part of the testatrix, and that fraud, undue influence, duress, misrepresentations, etc., were practiced upon her. The probate court certified the hearing to the circuit court, where the jury found in favor of contestants. The trial judge promptly and properly entered judgment *non obstante veredicto* in favor of the proponent of the will. He found that neither mental incompetence nor undue influence, fraud, etc., were shown. In the event that the will and codicils had been disallowed, it is not shown whether Mrs. Dell would have claimed the bulk of the estate under a former will.

The questions are largely of fact. It is well nigh impossible to review even briefly the many incidents that arose in the drab life of the testatrix. They are related in the several hundred pages of testimony of over 40 witnesses. Contestants sought to prove mental incompetence by the testimony of a doctor who treated the testatrix for a fistula at a hospital confined to the treatment of rectal troubles. Although he stated that she suffered from *senile dementia* on account of her age, in accordance with his theory that everyone arriving at the age of 65 begins to suffer from *senile dementia,* and that at the age of 70 to 75 the disease is progressive, he did not state that she was incompetent to make a will, but on the contrary, advised her to attend to her business matters at once. Three doctors who attended her showed that her mental condition was good. An attorney who had drawn previous wills for her testified that he had refused to draw a will for her because he did not believe her competent to make a will. It was shown, however, that he saw her just when she was recovering from pneumonia, and that thereafter, partly with his knowledge, participation, or advice, she executed important legal documents and transacted business requiring greater mental competence than the making of a will. The testimony shows beyond any question that the testatrix was mentally competent to make a will.

The only other important question is whether the execution was obtained through undue influence, fraud, duress, misrepresentations, etc. Several incidents are claimed to show undue influence. At one time she consulted a fortune teller, who, it is claimed, told her to leave her property to Bess. Mrs. Dell, who appears to be the main contestant,

and who had herself consulted a fortune teller, aroused Mrs. Alvord's interest in the ability of fortune tellers. In a letter telling about her own experiences, Mrs. Dell wrote to Mrs. Alvord that a fortune teller had told her that one of Mrs. Dell's relatives, answering Mrs. Alvord's description perfectly, was trusting someone who was going to bring her a great loss in the future. Mrs. Dell sent her a bitter letter in which she referred to some of Mrs. Alvord's friends as "jail birds," and stated that there was nothing on earth that could ever again make her take one thing from Mrs. Alvord. The latter replied, stating that she showed the letter to her lawyer and other friends, and that she was not deserving of such treatment. She took Mrs. Dell at her word and cut her off with a legacy of a dollar. She did remember Mrs. Powell, a sister-in-law, with a very substantial legacy. She also looked after other people who had been kind to her.

It was the right of Mrs. Alvord to make such disposition of her property as she saw fit, notwithstanding the fact that a jury or others might have preferred a different disposition of her property. It is unnecessary to recite other minor incidents shown by contestants as evidence of undue influence. We do not believe that they rise to the dignity of proof, or that they would be of sufficient importance, if true, to establish contestants' claims. The most that can be said is that the testatrix was a strong-willed old lady, with a few eccentricities, and one great interest in her life—her son. While there was ample opportunity for undue influence, and probably the desire on the part of many of the interested parties to share in her bounty, there is no showing that the old lady was prevented from seeing whom she wanted and from doing substantially what she

pleased. She showed kindness and judgment in remembering her former servant and also her housekeeper, and providing for others, including the Powell family. After the drafting of the will she transacted her business understandingly. The right to make a will should be carefully vouchsafed to elderly persons who have testamentary capacity. Mere opportunity to exercise undue influence, the fact that property is not disposed of in the manner that a judge or jury would have preferred, or the fact that beneficiaries appear not to be as deserving of testamentary bounty as others might be, do not, of themselves, affect the validity of the will.

We find in the present case that the will and codicils were properly executed, that the testatrix was mentally competent to make a will, that there was no undue influence, fraud, duress, force, restraint, misrepresentation, etc., practiced on her, and that the will and codicils were properly allowed. So many of the questions raised have been so frequently ruled upon in recent years that we need not restate well-known principles, but shall simply refer to the following cases: *In re Luders' Estate,* 238 Mich. 87; *In re Ferguson's Estate,* 239 Mich. 616; *In re Littlejohn's Estate,* 239 Mich. 630; *In re Kirschbaum's Estate,* 242 Mich. 291; *In re Aylward's Estate,* 243 Mich. 9; *In re Spinner's Estate,* 248 Mich. 263; *In re Estate of Trombley,* 251 Mich. 117; *Brereton* v. *Estate of Glazeby,* 251 Mich. 234; *In re Kenney's Estate,* 250 Mich. 289; *In re Hayes' Estate,* 255 Mich. 338.

The judgment is affirmed, with costs to appellees.

Clark, C. J., and McDonald, Potter, Sharpe, North, Fead, and Wiest, JJ., concurred.