## *In re* VALLENDER'S ESTATE.
## WITZKE *v.* VALLENDER.

1. WILLS—MENTAL COMPETENCY—GUARDIANSHIP—EVIDENCE.

In will contest, evidence disclosed that notwithstanding technical guardianship of blind testator, which antedated execution of will by more than three years, it also showed that to a large extent he continued to conduct his own personal and business affairs, thoroughly understood of what property he was possessed and of which he was making testamentary disposition, and who were the natural objects of his bounty.

2. SAME—UNDUE INFLUENCE—EVIDENCE—OPPORTUNITY.

In will contest between testator's three adult daughters whose relations with him were either estranged or scant and young woman, unrelated to him but who was made sole beneficiary of estate aggregating between $5,000 and $6,000, where it appears latter and her parents lived in testator's home and that she had been in fairly constant attendance upon testator whose eyesight was at first impaired and then lost, and record discloses testator well knew contents of will, executed about a year and nine months before he died at age of 86 or 87 years, and made no attempt to revoke it, it was error to hold will invalid on the ground of undue influence, the ample opportunity afforded therefor being insufficient to effect such result.

3. SAME—UNDUE INFLUENCE—OPPORTUNITY.

Proof of circumstances affording opportunity to exercise undue influence, standing alone, is insufficient to establish undue influence.

4. SAME—MENTAL COMPETENCY—GUARDIANSHIP.

Fact that a ward was adjudicated mentally incompetent to have the care, control and custody of his property because of his age does not necessarily imply that he would not be sufficiently competent to make a will.

5. SAME—MENTAL COMPETENCY—CONTRACTS.

Less mental capacity is required to make a valid will than to make contracts.

6. SAME—MENTAL COMPETENCY—QUESTION OF FACT.

If testator was capable of reasoning and taking reasonable action, he was capable of making a will, and neither court nor jury has a right to substitute their views for those of testator; and the right to make a will should be carefully vouchsafed to elderly persons.

7. COSTS—RECORD—COURT RULES.

No costs on appeal are allowed appellant where record on appeal includes much repetitious and immaterial testimony, which together with the failure to observe court rule requirement that testimony be set forth in narrative form resulted in a record over twice necessary length (Court Rule No. 66, § 9 [1933]).

Appeal from Bay; McCormick (James L.), J. Submitted October 23, 1944. (Docket No. 82, Calendar No. 42,905.) Decided January 2, 1945.

In the matter of the estate of Henry John Vallender, deceased. Dorothy Witzke presented the will of Henry John Vallender, deceased, for probate. Florence M. Vallender, Ethel Klepser and Marguerite Stewart contested probate of will. Contest certified to circuit court. Judgment for contestants. Proponent appeals. Reversed and judgment for proponent ordered entered.

*Bernard S. Frasik,* for proponent.

*Leibrand & Leibrand,* for contestants.

NORTH, J. This is a will contest tried upon certification from the probate court in the circuit court without a jury. From the judgment disallowing the will of Henry John Vallender, deceased, the proponent, Dorothy Witzke, to whom deceased left all of his estate, has appealed.

The contestants, three daughters of the deceased, assail the will both on the ground that their father was mentally incompetent at the time of its execu-

tion and that he was unduly influenced in making the will. As to mental incompetency having been proven, the conclusion of the trial judge is indicated by the following from his findings: "I hesitate to find, even after considering the fact that the deceased was under guardianship, that the deceased was mentally incompetent to dispose of his property by will at the time the will was executed." As to undue influence the trial court found contestants' contention sustained; and apparently on that ground disallowed the will.

Reasonable brevity in this opinion forbids recital of all the factual details appearing in the record of substantially 300 pages; but the general factual background may be stated as follows. The testator, Henry John Vallender, died in November, 1941, at the age of 86 or 87. His wife had died in 1921. The surviving children are the three daughters who are contesting their father's will. They are Florence M. Vallender, Marguerite Stewart, and Ethel Klepser. At the time of the trial (1942) they were of the following ages: 36, 32 and 29. The will was executed February 15, 1940. None of the daughters had resided at the home of their father in Bay City since 1935 or 1936. As to Florence and Ethel the fact that they did not reside with their father is accounted for by reason of their having gone away from home in obtaining an education, employment, and the subsequent marriage of Ethel. At the time of the trial Florence resided in Painesville, Ohio. Ethel and her husband went to reside in Washington, D. C., in 1936. At the time of the trial Marguerite was married and living in Portland, Oregon. When Marguerite was 25 or 26 years old (1935–1936) she was residing with her father in his home in Bay City. At that particular time there was also living in the home an unmarried brother and sister of tes-

tator. Marguerite, then employed in Bay City, left her father's home, and seemingly thereafter was quite completely estranged from him notwithstanding for some considerable time she continued to reside in Bay City. There is testimony indicating that Marguerite never returned to her father's home after 1935. Neither Marguerite nor Ethel were witnesses at the trial.

For many years during the latter part of his life the testator was afflicted with failing eyesight; and finally he became totally blind. It was while he was so afflicted that Marguerite, as the last of his three daughters to leave home, went elsewhere in Bay City to reside in 1935 or 1936. As noted above, a brother and sister of testator were then residing with him, and continued to do so for a number of months. For three or four years prior to the time Marguerite left home Dorothy Witzke, the sole beneficiary under and proponent of testator's will, was employed from time to time to aid in performing household duties in the Vallender home. Dorothy was about 18 years of age when Marguerite left home. At this time and in later years the testator became much attached to Dorothy because of her companionship and the assistance given by her to him in getting about while handicapped by impaired vision and in aiding him in looking after his business matters. A further circumstance which seemed to account for Henry Vallender's fondness of Dorothy Witzke was that earlier in his life he had a daughter of his own named Dorothy who died while very young; and the testator came to look upon Dorothy Witzke as his own daughter Dorothy. There is testimony that he said, "I consider her my daughter." In 1936, testator's brother and sister, who were then residing in his home, were planning to return to Chicago. Dorothy Witzke had been helping as formerly with

the household duties in the Vallender home. The parties concerned desired her to continue in this capacity; but Dorothy felt she could not do this unless some other adult persons came to reside in the home. Arrangements were made, at least in part at the behest of testator's brother and sister, that the other members of Dorothy Witzke's family should move into the Henry Vallender home. This was done in 1936, at which time the Witzke family consisted of Mr. and Mrs. Witzke, their daughter Dorothy, and two young sons. Mr. and Mrs. Witzke and Dorothy continued to so reside until the death of Henry Vallender in November, 1941.

Some light is thrown upon the apparent arrangement under which Dorothy and her family moved into the Vallender home by the fact that on July 7, 1936, an attempt was made to have instruments executed which in substance obligated Mrs. Witzke and Dorothy to provide proper care, maintenance, et cetera, for Henry Vallender in his home and a suitable burial upon his death, in consideration of which the latter executed a warranty deed to Dorothy and her mother of the Vallender home property. However, for reasons which here need not be detailed, this attempted transaction appears not to have been fully consummated; and nothing is claimed for it in this suit aside from the possible bearing upon the relation and the intention of the parties as early as 1936.

Shortly following the attempted transaction just above noted, Marguerite Vallender on August 4, 1936, filed in the probate court of Bay county a petition to have a guardian of the person and the estate of her father appointed. In her petition Marguerite recited that her father was 81 years old, that he was blind, and mentally incompetent to have charge and management of his person and estate; that he had

recently given a $500 bond to "a certain Witzke family" and without consideration deeded his homestead, "and is depriving himself of his property necessary for his support." At the outset there seems to have been opposition in the probate court by Henry Vallender to the appointment of a guardian; but by way of compromise he finally practically consented to the appointment of his brother-in-law, Arthur Vallender, as guardian of his person and estate. Such guardianship continued until the death of testator. It should be noted that in the meantime two petitions for termination of the guardianship on the ground that Henry Vallender was mentally competent were filed in the probate court. Neither of these petitions seems to have been very vigorously prosecuted and there is testimony that while the first one of the two was pending Henry Vallender with his guardian, Arthur Vallender, went to the probate court and in effect stated that testator had no objection to the continuance of the guardianship and that he desired the help of his brother-in-law, Arthur Vallender. Under the circumstances the guardianship was not terminated; but the record discloses that notwithstanding the guardianship over him, Henry Vallender continued personally to control everything that was done as to his individual welfare and care, and as to his property he seems to have continued to give consideration to, and to control, the great majority of his transactions. Even the guardian, before determining what should be done as to the transactions which were carried out by him, seems to have quite uniformly first consulted with his ward, Henry Vallender. During the pendency of this guardianship testator owned (aside from some vacant lots which were sold) three pieces of real estate. One was the property in which he resided, and the two others were rented. There is

testimony that the approximate value of these three pieces of real estate was $5,000 to $6,000. The rentals received were approximately $35 per month. The business transactions of testator, aside from paying bills for items having to do with his personal needs, consisted for the most part in the collection of rentals, payment of taxes, insurance, repairs, et cetera, in the management of his real property. For a short time some of the rentals were paid to the guardian, but for the most part they were paid direct to testator. During the guardianship a new furnace was installed in one of the rented places under a transaction arranged directly with the testator, and payment therefor was made by him. From the above and other items disclosed by the testimony it is apparent that while testator was technically under guardianship subsequent to 1936, nevertheless to a large extent he continued to conduct his own personal and business affairs.

At the hearing in the circuit court numerous witnesses in behalf of proponent gave testimony tending to support her claim that at the time of making the will the testator was mentally competent; and on the other hand a number of witnesses in behalf of contestants testified to circumstances claimed to indicate the testator's incompetency. Dr. William Kerr, Henry Vallender's personal physician, was called as a witness by contestants; but notwithstanding this doctor's rather unusual opportunity to observe the mental condition of testator, whom he was attending practically at the very time the will was made, he did not testify that testator was then incompetent to make the will. Instead the following testimony indicates the doctor's position.

"*Q.* Leaving aside this condition of blindness, Doctor, in your judgment was Henry Vallender on

February 15, 1940 (the date the will was executed), in a physical and mental condition to transact any business requiring the exercise of judgment, reasoning faculties, and a consecutive continuation of thought?

"*A.* I think not.* * * My reason is based on the fact that he had alienated his family—he had done things which people in senility frequently do when their mind begins to fail, they turn away from their own and take up with other persons that have other kinds of interest. * * *

"*Q.* You wouldn't say, Doctor, that on February 15, 1940, that Mr. Vallender was a mentally incompetent person, would you, Doctor, only attending to him in a medical way and administering to him?

"*A.* I couldn't say that that was any particular feature of his condition. * * *

"*Q.* You wouldn't say that he was mentally incompetent then, would you, Doctor?

"*A.* His mental incompetency wasn't so specific that you could say he was insane, but he was erratic, he was emotional."

In another portion of his testimony the doctor disclosed that in using the term "senility," he used it in the sense that "Senility means age, general speaking." Notwithstanding the testimony of some other witnesses for contestants was to the effect that testator was "childish," "odd," "nervous," "moroseful," and that he had a better memory of things that happened a long time ago than of more recent happenings, still the record clearly indicates that at the time the will was made Henry Vallender thoroughly understood of what property he was possessed and of which he was making testamentary disposition, who were the natural objects of his bounty, and understood what disposition he was making of his property. *In re Walker's Estate,* 270

Mich. 33; *In re Grow's Estate,* 299 Mich. 133. And in this connection it may be noted that shortly after the will was made testator and Dorothy Witzke went to the office of the lawyer who had possession of the will and its contents were again read and considered by the parties. The testator lived about a year and nine months after the will was executed, and during that time he unquestionably had knowledge of the contents of the will and could have altered the same had he seen fit to do so. Under this record it cannot be held that the will was invalid because of mental incapacity of the testator at the time the will was executed.

The remaining question presented on this appeal is whether the record fails to sustain the trial judge's holding that "the will was the result of undue influence on the part of the proponent herself, or her mother, acting in her behalf." It was nearly four years after the Witzkes came to reside in the Vallender home that the will was made. At that time and for some days prior thereto the testator had been confined to his bed by illness—a hard cold and possible pneumonia. However, the testimony shows that he must have recovered rather speedily because a fortnight later he went to the office of the attorney who drew the will. At the time the will was drawn and signed the proponent, Dorothy Witzke, was not present. Instead she was confined in a hospital for treatment of an ear trouble. The attorney who drafted the will was called by telephone to the Vallender home by proponent's mother. Concerning her calling the attorney her undisputed testimony is:

"He (testator) had spoken about a paper that he has [had?] made out for Dorothy a couple years back (evidently meaning the agreement and deed hereinbefore noted) and he was talking about that and he wondered what had become of it, and he asked me to

go and call you (the attorney) and have you come over, he wanted to have a visit with you, and he said that Dorothy was of age now and he wanted it fixed right for her.''

The record is not too convincing as to whether the attorney was told by Dorothy's mother that drafting of a will was in prospect; but the attorney brought with him a blank form of a will. The will was prepared and its execution witnessed by the draftsman, his son, and Dorothy's mother. Since the attempted transaction of July, 1936, Henry Vallender had lived in his own home in family relation with Dorothy and her parents. The undisputed record is that he had very good care. Prior to February 15, 1940, Dorothy was employed part time—three or four days a week—at the Chevrolet factory; and her mother was also employed part time for a couple of days each week. Notwithstanding this it fairly appears some member of the Witzke family was almost constantly available to attend to the wants of testator. The testimony is to the effect that except during the hours of her employment Dorothy was almost a constant companion of testator and aided him, not only incident to his personal wants but also incident to his business transactions. As hereinbefore noted, the testator came to look upon her as his own daughter Dorothy. The record does not indicate there was any delusion on his part in this particular; but instead it discloses his kindly and personal feeling towards Dorothy Witzke. During the years that had intervened since testator's own daughters left home they had not been too attentive to their father, especially in view of his unfortunate affliction of blindness. Florence and Ethel came to see him about once in each year; but Marguerite, even during the years she resided in Bay City, ac-

cording to the testimony, did not come to see her father nor did she later visit his home. It clearly appears from the record that testator was much distressed by the attitude of his own daughters toward him. While, as pointed out by appellees, all during the years following July, 1936, the Witzkes occupied as their home without charge the dwelling of the testator, on the other hand they provided his meals, looked after his personal needs which were greatly enhanced by reason of his blindness, and Dorothy was the one who on frequent occasions accompanied him in going about the streets of Bay City. It may be noted the opportunity that the Witzkes had of residing in the Vallender home can scarcely be thought of as a full or fair compensation for the care and service rendered to the testator. The total value of the estate passed by his will to Dorothy Witzke would not exceed $5,000 or $6,000. In other words, the estate passed by the will was not large, the will was simple in its terms, and under all the circumstances it cannot be said the disposition of the testator's property was either unjust or unnatural.

There is no direct testimony of coercion or persuasion brought to bear upon the testator at the time of making the will. Instead appellees rely (as must be done in most cases) upon inferences to be drawn from circumstances shown. They stress the claim that the Witzkes made it unpleasant for relatives and others when they came to visit the testator, and that he was almost constantly in the presence of some member of the Witzke family, and thereby prevented from privately talking to or consulting with others. But the record discloses numerous occasions when testator conversed with others without any of the Witzke family being present. On one or more occasions after the will was executed testator visited privately with the guardian, Arthur Vallen-

der, who was a witness for contestants. Shortly after making the will, testator told Dorothy Witzke what he had done. About two weeks later they went to the office of the attorney who drew the will, who was named as executor, and who had possession of the will, and it was there read over and its contents fully revealed. Testator lived approximately a year and nine months after the execution of the will; but there is no proof of any attempt on his part at any time to revoke the will.

Careful consideration of the record brings the conclusion that the will of Henry Vallender should not have been held to be invalid on the ground of undue influence. Admittedly it appears from this record that there was ample opportunity for the exercise of undue influence but that alone is not sufficient to invalidate the will.

"Proof of circumstances affording opportunity to exercise undue influence, standing alone, is insufficient to establish undue influence." *In re Kenney's Estate* (syllabus), 250 Mich. 289.

From among the many decisions of this Court in the light of which the instant case must be decided, we quote the following:

"Fact that a ward was adjudicated mentally incompetent to have the care, control and custody of his property because of his age, does not necessarily imply that he would not be sufficiently competent to make a will." *In re Johnson's Estate* (syllabus), 286 Mich. 213.

"It is elementary that less mental capacity is required to make a valid will than to make contracts. *Kempsey* v. *McGinniss*, 21 Mich. 123, 141, and *In re Barney's Will*, 187 Mich. 145, 157. In passing upon the capacity of the testatrix to make a will attention should be directed to the character of the instrument

which she executed. The will in question is one of exceeding simplicity and easily understood by one of even limited intelligence. Even if it could be shown that the testatrix had not sufficient mental capacity to understand a lengthy complicated document, which is not the case, this will could not be set aside if it was such a paper as under the evidence in the record the testatrix could and did readily understand. *Kempsey* v. *McGinniss, supra,* and *Porter* v. *Throop,* 47 Mich. 313, 324." *In re Weber's Estate,* 201 Mich. 477, 482.

"If testator was capable of reasoning and taking reasonable action, he was capable of making a will, and neither court nor jury has a right to substitute their views for those of testator." *In re Lembrich's Estate* (syllabus), 243 Mich. 39.

"The right to make a will should be carefully vouchsafed to elderly persons who have testamentary capacity." *In re Alvord's Estate,* 258 Mich. 497, 503.

As bearing upon taxable costs in this Court, we are constrained to note the following. The printed testimony covers nearly 300 pages of the record. With possibly very few exceptions, this part of the record is a full transcript of the questions asked at the trial and answers thereto. There is no semblance of any attempt to fairly comply with Court Rule No. 66, § 9 (1933), which provides that in the record on appeal "The testimony * * * shall be set out in narrative form unless the trial court shall deem it necessary to a full understanding of the questions involved that it be set out in full or in part by question and answer, in which case the trial court shall so certify in writing." Notwithstanding the certificate of the circuit judge in the instant case to the contrary, there is no justification for presentation of this record in the manner above indicated.

As presented the record is full of repetitious matters and contains much testimony which is wholly immaterial. Failure reasonably to comply with the above-quoted rule provision cannot be tolerated. Such failure materially increases the cost of the record on appeal and adds greatly to the work of this Court. Had it been properly prepared the instant record would have been reduced by at least one-half.

The judgment entered in the circuit court will be reversed and judgment entered there sustaining the will with costs to proponent of the trial court; and the case will be remanded to the probate court for further proceedings. Because of failure to comply with the rule provision in preparing and filing a proper record on this appeal, as hereinbefore noted, no costs will be awarded in this Court to appellant.

STARR, C. J., and WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.