FOX *v.* JOSLIN.

1. EVIDENCE—MENTAL INCOMPETENCY—OPINION EVIDENCE—FOUNDA-
TION.

   A witness may not give an opinion as to the mental incompetency of another without first laying before the court the facts upon which the opinion is based, and then may

On presumption and burden of proof as to mental incompetency with relation to conveyances, see notes in 17 L. R. A. 494; 36 L. R. A. 723.

do so only if the court is satisfied that a sufficient founda-
tion has been laid.

2. DEEDS—MENTAL INCOMPETENCY—UNDUE INFLUENCE—EVIDENCE—
SUFFICIENCY.
    In a suit to set aside a deed on the grounds of mental in-
    competency and undue influence, evidence *held*, insufficient.

3. SAME—OPPORTUNITY ALONE INSUFFICIENT.
    Evidence of mere opportunity is insufficient to establish
    undue influence.

4. SAME—DEED AS GIFT NOT VOID FOR WANT OF CONSIDERATION.
    A deed executed as a gift and to take the place of pro-
    visions in a will may not be set aside for want of consider-
    ation at the instance of grantor's heirs after her death.

Appeal from Wayne; Sample (George W.), J., pre-
siding.    Submitted October 4, 1923.    (Docket No.
31.)    Decided December 19, 1923.

Bill by Charles L. Fox and another against Levi
J. Joslin and another to set aside a deed.    From a
decree for plaintiffs, defendants appeal.    Reversed,
and bill dismissed.

*Frank J. Riggs,* for plaintiffs.

*Edward D. Devine,* for defendants.

WIEST, C. J.    The bill herein was filed to set aside
a deed executed July 13, 1916, by Phebe M. Cheney,
conveying certain property in the city of Detroit to
defendants, on the grounds that the grantor was
mentally incompetent to execute the deed and was in-
duced to do so by undue influence exercised over her
by defendants.    Mrs. Cheney was plaintiffs' aunt.
At the time of the execution of the deed she was about
75 years of age.    She lived alone, kept her own house
and transacted her own business affairs, consulting
an attorney when she felt the need of doing so.    In
March, 1916, she executed a will, drawn by herself,
devising her real estate to defendants.    Just before

executing the deed she called at the office of Mark W. Hearn, an attorney then in practice in the city of Detroit, and who had been her legal advisor, and informed him she had made a will, by the terms of which she had devised certain real estate, and asked him if he was absolutely certain a will was the safest and surest way of conveying property, and stated she wished to avoid all possibility of having the devise attacked after her death.   He suggested to her that a safer and surer way would be to convey, by warranty deed, to the parties to whom she wished it to go and reserve in the deed a life interest in and to the use of the property.   Some few days later she requested the attorney to call at the home of defendants, where she was, and there she executed the deed.

Was Mrs. Cheney mentally incompetent to execute the deed?   This question requires a review of the testimony.   Evelyn Nicholson, a witness for plaintiffs, testified she roomed at Mrs. Cheney's home about nine months in 1913-1914.   When Mrs. Cheney spoke to her about having plaintiff Fox come and attend to her affairs she advised Mrs. Cheney: "If you bring him here it won't be no time he is here before you will quarrel with him the same as you do with everybody else;" when Mrs. Cheney's husband died in December, 1913, she was present at the death bed and Mrs. Cheney came into the room and asked her husband how he was, and if he wanted some liquor, and when he made no reply she expressed the desire to have him speak to her once more, and then went into the kitchen and was ironing when her husband died; that Mrs. Cheney talked about her neighbors "something ridiculous," and talked falsely about them, in the opinion of witness; that Mrs. Cheney used profane language and called some of her neighbors "all kinds of names," even saying that "some were everything but ladies," and what she said was untrue, so far as the witness knew anything about the people;

at times in the night she imagined there were people
in the house and got the witness up several times to
help her investigate, but their efforts were unavailing
in locating anyone in the house; that she said people
going through an alley were going to a barn to steal
something; that if witness spoke to anybody Mrs.
Cheney wanted to know who they were and how long
she had known them; that she said her sister-in-law
was "no good."     After witness left the home of Mrs.
Cheney she says she met her a few times but never
spoke to her but said she had heard through others
that Mrs. Cheney talked about her "something ridicu-
lous," but never said anything to her and "it would
not have been well for her to have done it."     She
also testified that Mrs. Cheney used to go to lodge and
would talk about the people there after she got home,
calling them names, and that witness knew some of
the people and the things Mrs. Cheney said about them
were not true.     Upon this foundation the witness
was asked to express her opinion as to whether Mrs.
Cheney, was sane or insane, and was permitted to
answer, over objection, and stated:

"Well, I would say that she was as near insane as
anyone I ever saw; to see anybody call people names
and ridicule them and everything.     I lived beside a
lady one time that was—"

Further answer was objected to, and witness was
then asked:

"Q. You lived around insane people?
"A. Yes, right next door to one, just the same as
she was."

Witness was also asked:

"Q. Now, what would you say about her being a
person who could be influenced?
"A. Yes, I think she could."

This was objected to as calling for a conclusion and

having no basis in the testimony.    Then the witness was asked:

"*Q.* How did you form your opinion as to her being influenced?

"*A.* Well, because of the way that she would do with different people.    She would talk so nice about them, and everything and then turn around and talk so ridiculous about them."

It hardly seems necessary to say that this testimony afforded no foundation warranting the witness in expressing an opinion upon the mental capacity of Mrs. Cheney.    In no event can the mere opinion of such a witness be any more helpful than the relation of facts upon which the same is based.

What probative value had this testimony?

Ironing incident.    In moments of great anxiety human emotions run in no fixed groove.    Lamentation at the hour of dissolution of a loved one may be the spontaneous outburst of one nature, and quiet grief, best lenified by the routine of homely household duties, of another.    Suppose Mrs. Cheney was in the kitchen ironing at the time of her husband's death? What of it?    What bearing had it upon her mental capacity?    None whatever.    To say it had, would at the most confuse propriety with mental capacity.

Talk about her neighbors.    We apprehend that a woman may talk about her neighbors if she wants to do so without being adjudged insane, even though her talk is thought by another to be ridiculous.    Gossip is not always true; and gossips are not all crazy nor mentally incompetent.    We are not informed of what she said about her neighbors, but only that "she talked ridiculous" about them and what they were doing, and the witness did not agree with her.    Use of profanity is no evidence, in and of itself, of want of mental capacity.    The time has not yet come when a woman may not say about other women "they are everything

but ladies," without incurring the brand of mental incompetency.

Noises at night. The householder who has not got up in the night, upon hearing or imagining hearing some noise indicating the need of investigation or so disquieting in effect as to put nerves at tension, and prowled around the house to see whether everything was all right, probably does not exist. Of course, it was inexcusable for this old woman who feared thieves to ask her woman roomer to get out of bed and help her search the house, but it was not an evidence of mental derangement, even though her fears came over her frequently. We are not prepared to hold that old maids, widows, cautious females and timid males may not look under the bed or about the house at bedtime, or any other time they see fit or become apprehensive, in order to satisfy themselves there is not a man in the house, without having such timidity or precaution linked up as evidence of mental deficiency.

Curiosity. What a common sense of curiosity was openly disclosed by this old woman in asking the witness the names of persons speaking to her and how long she had known them.

Home from a meeting. We had supposed it was the privilege of women, upon returning from any public gathering, to talk about the other people there. We are not to be understood, however, as saying this is only true of women.

When this witness stated that it would not have been well for Mrs. Cheney to have said certain things to her, she let fall in an illuminating way her estimate of the accountability of this old woman, for certainly she would not take such an attitude toward one she considered so bereft of mentality as to be incapable of forming judgment and carrying out design. The supposed basis for the witness expressing an opinion

that Mrs. Cheney could be influenced is too flimsy to deserve further comment.

Mrs. Cheney's brother John was a soldier in the civil war and drew a pension. In August, 1918, he was committed to Eloise hospital as insane, and died there in October, 1919. The fact that the wife of her brother had him sent to the hospital as a public charge caused Mrs. Cheney to declare she would never again enter her sister-in-law's house, and when her brother's remains were brought home she kept her resolve, even against the urging of her friends and the invitation of the widow, and did not attend the funeral services at the home but was present at the services in the cemetery, where she asked to have the casket opened that she might view the remains. The widow at first refused but the casket was opened and Mrs. Cheney laid a wreath and a small flag upon the remains and said, "Good-bye, Johnny." Plaintiffs seem to think this incident has an important bearing upon the case. So far as helping their case they are wrong. Evidently Mrs. Cheney had a mind of her own at the time her brother died, two years after the execution of the deed. Her resolve, and reason for it, showed no lack of intellect, and the keeping of it under such trying circumstances exhibited a firmness of mind negativing all the opinion testimony in the case that she could be easily influenced. But it may be said that, such a person, if her mind was poisoned against another by the venom of slander, would fall an easy victim to the machinations of the crafty and if once bent to their will would stay bent. We can conceive of such a mentality ruled by unreasoning stubbornness and so guileless as to permit the wily to capitalize such imagined strength, but we do not believe we have such a case before us.

Mrs. Cheney had her nephew come from Oregon, expecting he would be an aid and comfort, and when her expectations were not realized and the nephew

wanted her to buy a farm and build an apartment house and was not in accord with the way she wanted to live, she severed the confidential relation.

In July, 1915, plaintiff Fox, by registered letter, sent Mrs. Cheney a bill charging her, among other items, $5 a month for his son Francis staying nights at her home for 7 months. This was before she made the will cutting him off with one dollar and about a year before the deed to defendants. Plaintiff Fox now insists that, if his aunt had not been influenced against him, she would not have cut him off by giving her property to defendants. He may have been looking too far from home for the reason, as it is seldom the bounty of an aunt is moved in favor of a nephew charging $5 a month for letting his son sleep at her house. His petty charge clearly disclosed the state of his mind toward his aunt, and we may safely assume was not taken by her as an evidence of affection or good will, even though he was willing to credit the $35 on $50 he had borrowed. This act showed the caliber of the man and Mrs. Cheney was shrewd enough to see it.

The mental state of Mrs. Cheney could not be shown by witnesses who knew her brother and testified they were familiar with his actions previous to the time he was confined as an insane patient, and that Mrs. Cheney's actions were very much like those of her brother and in some instances worse, in their judgment. This is no way to prove a fact. We do not know what actions of Mrs. Cheney's brother were in the minds of the witnesses when they drew the comparison, and if we did know it would not be a matter of comparison with her brother. We have many times held, and it ought not to be necessary to repeat, that a witness may not give an opinion as to the mental incompetency of another without first laying before the court the facts upon which the opinion is based, and then only do so if the court is satisfied a sufficient

foundation has been laid.    This rule was not observed in the case at bar.

To show how far the trial of the case departed from the rule mentioned is well illustrated in the testimony given by Henry Dean, who said he became acquainted with Mrs. Cheney in the spring of 1916, and kept his automobile in a garage facing the back of her lot and he saw her actions; that he knew her brother to speak to him.    Upon this foundation he was asked to give his opinion as to Mrs. Cheney's mental condition and he was permitted to say she was very queer, and he would have to say she was insane.    This witness did not state a single fact upon which he based his opinion.    The opinion evidence should all have been excluded.

In the attempt to show the insanity of Mrs. Cheney plaintiffs went back many years.    The answers to the hypothetical question put to Dr. Walker, a witness in behalf of plaintiffs, are not helpful.    Dr. Walker said no more than:

"I should say she was of an irritable disposition, and your description would indicate that she had some illusions or delusions with regard to some of these persons whom she seems to have abused or talked about; and if that increased within the last few years it would appear as though her age had influenced her deeds and her conduct.    While she may not have exhibited markedly insane conduct, yet it would appear that it was that of a person in whom certain senile changes were taking place."

And he further said, if a person of that kind had illusions or delusions they could be influenced.

"*Q.* If she was told that someone had made the remark about her that she was going insane, would that have any effect upon her, in your opinion, doctor?
"*A.* I think it might.
"*Q.* Would that influence her against them?
"*A.* It probably would."

Another doctor answered the hypothetical question as follows:

"I should say she (Mrs. Cheney) was a person very decided in her likes and dislikes, and acted unreasonably, which in my mind is insanity to a certain extent."

To what extent? This answer of the doctor is valueless. Has it come to pass that a person 75 years of age, in order to run the gauntlet of medical opinion, must, to pass as sane, not be a person very decided in likes and dislikes and not ever act unreasonably? A ninny could pass the first part of the test, but until limits are set to what is reasonable under any and all circumstances, or what is greatly more or less than what might be expected in reason of ordinary human beings of such an age, whether a person could pass the second part of the test would depend too much upon the individual view of the doctor. Of course, the doctor accepted as true everything incorporated in the question, without benefit of explanation and wholly shorn of all circumstances accompanying claimed acts.

Other testimony deserves but scant notice. It is claimed Mrs. Cheney wanted Mrs. Benedict, who lived about a block away, to turn out one of her tenants because such tenant did not speak to her; that, in the home of Mrs. Burrell, who rented from her, she took a picture from the wall and wanted it put somewhere else saying she did not like it where it was and acted as though she wanted to run the house; that she would tell the same story over and over, and following the burial of her brother she said she saw two old women at the grave trying to flirt with a doctor.

Mrs. Cheney was probably censorious of others, not always right in her deductions, somewhat meddlesome and too free in expressing her mind, but we sit in judgment upon her acts only to the extent of deter-

225—Mich.—35.

mining whether they disclose a mind incapable of forming and carrying out intelligent purpose in executing the deed on the 13th day of July, 1916. The testimony offered by plaintiffs failed to establish want of mental competency to know what she wanted to do and will power to go ahead and do it, and the testimony offered by defendants clearly established her mental competency.

The evidence of undue influence outside of mere opportunity, which we have repeatedly held is not enough, was based on claimed statements made by Mrs. Cheney, that Mrs. Joslin had told her Mrs. Fox had said she, Mrs. Cheney, was crazy. It is somewhat inconsistent, to say the least, for the parties asking to have the deed set aside on the ground that Mrs. Cheney was crazy in 1916, to claim they have been wronged and Mrs. Cheney unduly influenced by reason of Mrs. Joslin's stating to Mrs. Cheney that Mrs. Fox had said she was crazy. Mrs. Fox denies that she said Mrs. Cheney was crazy, but admits telling Mrs. Joslin that Mrs. Cheney "had queer spells, very queer acting, and I thought she was an old childish lady, in her dotage." It strikes us as quite likely, if plaintiffs have faith in their case and in the efforts made to establish the fact that Mrs. Cheney was crazy at the time the deed was given and had been so for many years before, Mrs. Fox did so express herself to Mrs. Joslin. The charge of undue influence has not been established.

Mrs. Cheney had known Levi J. Joslin from his birth. She appreciated the kindly attention accorded her by defendants, was a widow without children, upon trial found her nephew unsatisfactory, and she had a right to give her property to defendants if she wanted to do so.

Plaintiffs urge want of consideration for the deed. This is not a case where want of consideration cuts any figure.

There seems to have been no effort made to direct the question of Mrs. Cheney's mental competency to the date of the giving of the deed in suit. The hypothetical question covered claimed acts of Mrs. Cheney for several years after the giving of the deed. The testimony of witnesses called by the defendants tended strongly to show the mental competency of Mrs. Cheney.

The plaintiffs have made no case and the bill should have been dismissed. The decree in the circuit is set aside and one will be entered here dismissing the bill, with costs to defendants.

FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.