*In re* FERGUSON'S ESTATE.

1. WILLS—MENTAL CAPACITY TO MAKE WILL—EVIDENCE.
   Where a husband suffering from an incurable cancer ad-
   vised his wife that he had devised to her certain real
   estate in his will, the fact that she disposed of it in her
   will as if she already owned it, before his death, is not
   indicative of her want of understanding of the nature and
   extent of her property, in view of the fact that her will
   did not speak until her death.

2. EVIDENCE — WILLS—MENTAL CAPACITY—OPINION OF LAY WIT-
   NESSES MUST BE BASED ON FACTS TO WHICH THEY TESTIFY.
   Lay witnesses may not give opinion evidence that testa-
   tor was mentally incompetent to execute a will without
   first giving such facts as, in the opinion of the court, show
   a reasonable basis for an opinion.

3. SAME—SUFFICIENCY OF EVIDENCE.
   The testimony of lay witnesses, *held*, to disclose no acts

   ¹Wills, 40 Cyc. pp. 1004, 1424; ²Id., 40 Cyc. p. 1038; ³Evidence,
   22 C. J. § 700; Wills, 40 Cyc. p. 1023.

of testatrix showing want of sufficient mental capacity on her part to make her will and codicils.

4. SAME—CAPACITY TO MAKE WILL.
   Legal capacity to make a will is not a subject of expert opinion.

5. WILLS — MENTAL CAPACITY — NOT ESSENTIAL THAT TESTATRIX COMPREHEND LEGAL PHRASEOLOGY EMPLOYED.
   It is not essential that testatrix should comprehend the legal phraseology employed in the making of her will by an attorney, but it is sufficient if she fully comprehended what was accomplished thereby.

6. SAME—RULE AS TO EXTENT OF MENTAL CAPACITY NECESSARY TO MAKE WILL.
   If testatrix, at the time she executed her will, had sufficient mental capacity to understand the business in which she was engaged, to know and understand the extent and value of her property, and how she wanted to dispose of it, and to keep these facts in mind long enough to dictate her will without prompting from others, she had sufficient capacity to make the will.

7. SAME—TESTATOR SUFFERING FROM MENTAL DISEASE NOT NECESSARILY INCOMPETENT.
   A testator may be suffering physical ills and some degree of mental disease and still execute a valid will, unless the provisions thereof are affected thereby.

8. SAME—REASON FOR LEAVING RELATIVE OUT OF WILL.
   While testatrix had an undoubted right to will her property to less than all of her relatives without having any reason beyond her own desire for doing so, she had what she thought was a good reason for leaving her brother, one of the contestants, out of her will.

9. SAME—BURDEN OF PROOF—DIRECTED VERDICT.
   Contestants, having failed to meet the burden of producing evidence tending to show want of sufficient mental capacity by testatrix to make her will, at the time it was executed, the trial judge properly directed a verdict in favor of proponent.

Error to Wayne; Miller (Guy A.), J.     Submitted

⁴Evidence, 22 C. J. § 760; ⁵Wills, 40 Cyc. pp. 1006, 1100; ⁶Id., 40 Cyc. p. 1004; 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444; 28 R. C. L. 86; 4 R. C. L. Supp. 1799; 6 R. C. L. Supp. 1703; ⁷Id., 40 Cyc. pp. 1006, 1009, 1011; ⁸Id., 40 Cyc. p. 1079; ⁹Id., 40 Cyc. p. 1333; 28 R. C. L. 398; 3 R. C. L. Supp. 1573; 6 R. C. L. Supp. 1725.

June 17, 1927.    (Docket No. 61.)    Decided July 29, 1927.

Eleanor I. McKay presented for probate the last will of Mary Ferguson, deceased.    On petition of John McKay and another, contestants, the matter was certified to the circuit court.    Judgment for proponent on a directed verdict.    Contestants bring error.    Affirmed.

*Dohany & Hersch,* for appellants.

*Frederic T. Harward,* for appellee.

WIEST, J.    This is a will contest on the grounds of mental incapacity and undue influence.    Proofs in the case were directed to the issue of mental capacity of the testatrix.    June 6, 1918, Mary Ferguson, then 81 years of age, having a husband but no issue, executed the will in suit, making bequests to 27 named beneficiaries in various amounts.    Those so named included three sisters, numerous nephews and nieces and two societies.    The residue she gave, in equal parts, to her husband, the Protestant Orphan Asylum, and the Florence Crittenton Mission, both of Detroit. April 2, 1920, she executed a codicil revoking a small bequest to Nellie Ferguson, her husband's niece, increased a bequest to a grandniece, and devised described real estate to two of her nieces.    June 10, 1920, she executed a second codicil in which she revoked the residuum clause of her will (her husband having died), increased bequests to several nieces and nephews, decreased one former bequest, gave $3,000 to the Protestant Orphan Asylum, $2,000 to the Florence Crittenton Mission, and $1,000 to the Home for the Friendless in Detroit.    She also made a small bequest to an old employee of her husband, and $200 each to her chauffeur and nurse, if they remained until her

death.    The residue she gave to the nephews and nieces to whom she bequeathed cash bequests:

"Each nephew and niece to receive such proportion of the said residue as the cash legacy so given to such nephew or niece bears to the amount of such cash legacies."

July 21, 1920, she executed another codicil merely revoking the appointment of one of the executors, leaving the other the sole executor.    She died August 3, 1923, leaving an estate of about $200,000.    Cerebral hemorrhage caused her death.

John McKay, brother of testatrix, not willed anything, and Belle Buchanan, sister, willed $1,500, are contestants of record.    The contest was certified to the circuit court.    At the close of contestants' proofs the court directed a verdict sustaining the will.    Contestants review by writ of error and insist there was evidence raising an issue of fact for consideration of the jury.    We think the circuit judge was right, and will state our reasons.

Mary Ferguson was born in the Highlands of Scotland, as was also her husband.    She was poor and did not have much education.    One child was born but died in infancy.    When the will in question was executed Mr. Ferguson was suffering from an incurable cancer.    He had made a will in which he devised to his wife certain real estate which she in turn, before his death, devised to two nieces.    She was advised by her husband that in his will he had devised such property to her, and she, knowing that fact and of his approaching death, felt free to devise the property, by will, to her nieces.    At her husband's death she took title under his will.    The fact that she so devised such property in the will, executed before her husband's death, and, therefore, before she became the owner thereof, is much stressed by contestants as indicative of her want of understanding of the nature

·and extent of her property.     Having in mind that her will did not speak until her death, we think there is nothing in the contention made.

It is well settled in this jurisdiction that lay witnesses may not give opinion evidence that a testator was mentally incompetent to execute a will without first giving such facts as, in the opinion of the court, show a reasonable basis for an opinion. *Fox* v. *Joslin*, 225 Mich. 536.     The testimony of the lay witnesses disclosed no acts showing want of sufficient mental capacity on the part of testatrix to make the will and codicils.

Mrs. Ferguson had a Highlander's opinion of a Lowlander, and in her hauteur twitted the chauffeur with being a Lowlander.     He outlived the Highlander and as a witness gave his opinion of her mental deficiencies.     His opinion rises no higher than the claimed facts he detailed and such facts failed to show mental incapacity on the part of testatrix to make the will.     As this witness was a principal one for contestants we will discuss his testimony.

William Haining, chauffeur, entered the employ of Mr. and Mrs. Ferguson in the fall of 1917, and was paid "a mere $40 a week."     He ordered the groceries and necessities, and, on occasions when help left, prepared meals.     He left in July, 1921.     He says he knew of no business transacted by Mrs. Ferguson. This was not strange as she had others for that purpose.     He also testified that all the time he was there she was under care of a doctor.     It is significant that contestants called the doctor who attended Mrs. Ferguson from 1911 until a week before her death and had him list her physical ailments and that he said she was mentally competent and was not suffering senile psychosis.     Haining said she was eccentric because she thought a maid and others were stealing things; that she had a key to a bureau drawer where

she kept "bits of things and money," forgot the hiding place and when she found the key would "make a big fuss." She gave away wornout clothing, terming it "beautiful stuff," and Haining knew it was rags; she was changeable in giving him orders; she did not talk with him much about her property but he thought she did not understand or realize what property she owned. He thought she did not know a $5 bill from a $50 bill because she could not see it on account of poor eyesight; that she would read, or pretend to read, papers but could not read a book, and, after pretending to read she would ask him what was in the paper; that she talked with him about her relatives and stated her opinion of some of them, and after a day or two "she would suddenly switch and instead of praising them she would ridicule them;" that sometimes she failed to recognize relatives and after she was told who they were she would say that "she didn't recognize them intentionally or that she didn't know them;" that in 1919 or 1920, her brother, John McKay, called and she did not know him but after being told "who he was she insisted upon his staying at the house and visiting and made quite a fuss about it." Being asked "Is that your opinion that she was not mentally bright enough and her mind not sound enough to understand the provisions of this codicil at that time (the codicil of April, 1920) ?" he answered:

"I would say not. I cannot tell. I am not a doctor. From my personal observation I would say she was not. * * *

"Q. When you say you could not testify upon her mentality what do you mean? * * *

"A. I think that is for some one that has more experience than I. * * *

"Q. From your personal observation what is your opinion as to whether or not she could understand the terms of this codicil of April 2, 1920, on that date?

"A. She could not."

On cross-examination he testified:

"*Q.* You do not know what mentality is required to make a will?

"*A.* Probably as much as the average man."

The witness also testified that Mrs. Ferguson was very close about paying money to people.

The contestants claim that the opinion evidence of two medical experts, based on statements made in hypothetical questions, showed want of mental capacity of testatrix to execute the will and should have taken the issue to the jury. The hypothetical questions included the claimed physical and mental condition of testatrix to the time of her death on August 3, 1923, five years after the execution of the will and three years after the last codicil. The basis for the opinions of the experts was the assumption that testatrix was afflicted with senile psychosis. The family physician, a practitioner of high standing and long experience, and called as a witness by contestants, testified, prior to the experts, that testatrix was not, in his opinion, afflicted with senile psychosis. The experts evidently gave little heed to such testimony, on the theory that, in the early stages of such disease, no one but an expert like themselves might detect it, and one even thought it advisable for old persons, before making wills, to be examined by some one in their branch of the medical profession. Senile psychosis seems to be a stage somewhere between normal mentality and senile dementia. One expert testified:

"Senile psychosis is a definite medical disease, a medical term for a disease. The symptoms of senile psychosis, and what this disease covers is a disease process involving primarily the brain. That is, in company with this brain process, there is degeneration in other faculties in the body, but diagnosis of psychosis is made upon involvement of the brain, in that we have a disturbance of memory, we have a disturbance of the ability of the patient to recall time,

place and person, we have disturbance in the emotional conduct, that is, namely, their moods; we have disturbances in their irritability, their loquacity, their ability to talk, to carry on connected conversations. We find disturbances in what we, as psychiatrists term the stream of thought. By the stream of thought, we mean the ability to carry one connected sentence with another, to carry the content of that sentence, as with the whole conversation. We find disturbances in insight and judgment. By 'insight and judgment' we mean the ability to decide situations that come up to them in everyday life; also, we find, as a result of that, definite changes, that is, of a pathological nature. * * * In the body—not only in the body, but usually in the brain. * * * Those changes are usually in the nature of a replacement of the normal brain cells by some tissue, or by the replacement with what we call lipoid material. * * * Accompanying that process we have a condition which we call arterio-sclerosis, namely, the little arteries leading into the brain gradually grow smaller and smaller; * * * high blood pressure usually is coincident with this change. * * * And arthritis condition in elderly people is this same process as we call it, this arterial sclerotic, thickening, going to other portions of the body."

He said the following are coincidents: Argyl-sinolitis, or the lime deposit about the eyes; ptosis (drooping of the upper eyelid); calcification of the tissues of the lymph nodes; deafness; cataracts of the eye.

Asked:

"*Q.* Do you diagnose a case of senile psychosis from the presence of one of these symptoms?"

He answered:

"Usually from the grouping. That is, we may have the presence of one symptom in the body, and that, of necessity, does not mean senile psychosis. But, where we have a grouping of symptoms showing that there is a degenerative process involving all of these various structures of the body, we group them together under

the group of senile psychosis, where the brain is involved as well."

The physical ailments mentioned may all exist without serious mental impairment. This the expert recognized in stating that the ailments are grouped together under the head of senile psychosis where the brain is involved as well. This sends us to the statements of mental manifestations incorporated in the hypothetical questions. The mental manifestations were detailed by lay witnesses and collectively disclose no mental incapacity to execute the will and codicils. This old woman was nearly blind. She read with difficulty and at times failed to recognize persons, but this was on account of her poor eyesight, except in one or two instances and then quickly corrected. Her means enabled her to employ others to take charge of the household affairs and her financial matters.

In April, 1922, or 21 months after the execution of the last codicil, she was examined at the Henry Ford hospital. At that time she was 83 years of age and the examining physician testified that she had a very senile appearance, high blood pressure, senile vaginitis and varicose veins. The physician noted "early senile psychosis; loquacity, mixing of complaints; a slight lack of memory, but vigorous will power," and she did not impress him as having some disease of the mind. He also noted a slight Parkinsonian expression of the face but she did not have Parkinson's disease (paralysis agitans), in his opinion. There is more than a suspicion that the experts, in their answers to hypothetical questions, tried the will as well as the mental capacity of the testatrix. The legal capacity to make a will is not a subject of expert opinion. *Page* v. *Beach*, 134 Mich. 51. Both expert witnesses disclosed, in their cross-examinations, that in answering hypothetical questions they included their own

ideas of legal capacity to make a will.    Upon this subject we call attention to the following testimony of one of the experts:

"*Q.* Now, supposing the testimony shows that her lawyer, whom she called to make this will, Mr. McCorkle, testified that she gave him these names without any assistance from anybody else and gave him the amounts she wished to give to each one, without any assistance, and that he went to his office and put it into the legal vernacular, wouldn't the fact that she carried the 25 or 24 relatives and institutions in her mind, and the amount she wished to give to each, make some difference in your opinion?

"*A.* It would, but did she understand the relation of these persons, one to another, and of amounts that she was granting each; did she have any conception of what those amounts meant in relation to her total property?   *   *   *   If she is able to do that, just as you stated, and in addition be able to judge each amount that she is giving to each person, in relation to her total property, and to know the identity and the relation of one of the persons to the other, then I would say there was considerable evidence that she had at least some degree of discerning judgment and memory.   *   *   *

"*Q.* She would have degree enough to make a will, if she could do that, wouldn't she?

"*A.* If she did all of those things, yes."

It is manifest this witness applied a test not recognized by the law.

The other expert witness testified:

"*Q.* What has she got to do to show mental capacity except to distribute to her relatives the property she had?

"*A.* She has to show the ability to know them, and the ability to recognize the relationship to her, and the ability to carry on the environmental associations and factors which have been taking place for the past few years, together with that.    The mere giving of a list is not sufficient.   *   *   *

"*Q.* Isn't that the business of making a will, picking out your relatives and giving them what you like?

You can be as capricious as you want to, can't you, in making a will? You can cut out all your relatives if you want to?

"*A.* I do not think so.

"*Q.* You do not think so. I will tell you that you can. If you want to make a will, you can cut out every relative you have and leave it to a cat or a dog, or an institution. Don't you know that?

"*A.* I knew that it had been done.

"*Q.* Did you think you could not do it?

"*A.* That I did not know.

"*Q.* You just said then that you understood it could not be done, didn't you?

"*A.* I said that I understood—

"*Q.* Have you been answering all these questions that you have been answering with that understanding in mind?

"*A.* No, sir.

"*Q.* What understanding have you had in regard as to whether a person can be capricious as long as he has the mental ability to make a will?

"*A.* I understand they can be capricious, but that does not mean that the capriciousness is just plain judgment to ascertain the facts and relationships."

Evidently neither one of these experts had in mind the true rule with reference to legal capacity to make a will. Both experts had read the will and seemed to think the terms employed therein were beyond the comprehension of testatrix. The technical wording of the will was the exercise of professional art by an attorney, and it was not at all essential that the testatrix comprehend the legal phraseology with the eye of a lawyer, but sufficient if she fully comprehended what was accomplished thereby. Few people understand the technical language of a deed, and were understanding of its technical words the test of mental capacity of the grantor few deeds could stand. Underlying the words employed by the lawyer in the will is the simple meaning readily understandable by a layman. No expert can be allowed to consider the technical words in considering the mental capacity

of the testator.    Few jurymen are capable of compre-
hending the stilted and coined medical terms having
simple underlying meanings, but this does not dis-
qualify jurors or seem to cause medical experts to de-
part from professional terms.    The experts appeared
to have cavalierly dismissed the testimony of the at-
tending physician that Mrs. Ferguson did not have
senile psychosis.    One of them stated:    "I would
say that he would not be able to discern the early
symptoms of early psychosis."    A mental disease so
obscure and unadvanced in its stage as not to be dis-
cernible to a high-grade, general medical practitioner
of 40 years' experience, in 12 years of frequent attend-
ance upon a patient, is too slight a disorder to destroy
mental testamentary capacity.    In this connection we
are reminded of the following language of Mr. Justice
COOLEY in *Fraser* v. *Jennison,* 42 Mich. 206, 234:

"Whatever court overturns a will ought to have
reasons to stand upon which are within the grasp of
the common sense of mankind."

The evidence of the experts does not meet this re-
quirement.    The simple rule with reference to legal
capacity to make a will does not appear to have been
understood by the experts.    We state the well es-
tablished rule:    If Mrs. Ferguson, at the time she
executed the will, had sufficient mental capacity to
understand the business in which she was engaged, to
know and understand the extent and value of her
property, and how she wanted to dispose of it, and to
keep these facts in her mind long enough to dictate
her will without prompting from others, she had suf-
ficient capacity to make the will.    A testator may be
suffering physical ills and some degree of mental
disease and still execute a valid will, unless the pro-
visions thereof are affected thereby.

We feel called upon to repeat what was said in
*Spratt* v. *Spratt,* 76 Mich. 384, 390:

"But what weight is opinion evidence entitled to where it appears that, unaided by any one, he does in fact make a will disposing of all his property, dictating consecutively the bequests and devises he sees fit to make to a large number of relatives, near and remote? *   *   *

"Now when, in the absence of fraud or undue influence, it is shown that the testator either wrote or dictated the will produced, the fact is established that he was capable, mentally and physically, of doing whatever the instrument shows was done; and the only question is, does the instrument on its face indicate that it is the emanation of an unsound mind, when applied to the facts and circumstances upon which, and under which, it was intended to operate, namely, the estate disposed of, and the manner of disposition?"

Mrs. Ferguson called to her aid an attorney of long experience, and high standing, and gave him full directions about the will she desired to make. The attorney testified to the facts and circumstances under which he prepared the will and the directions he received from Mrs. Ferguson in person. The will is not unreasonable in any of its provisions. The testatrix had no living issue, and no one had any call upon her bounty and her heirs at law no interest of which the will deprived them. While she had an undoubted right to will her property to less than all of her relatives without having any reason beyond her own desire for doing so, yet she did have what, she thought, was a good reason for leaving the contestant John McKay out of the will. It appears that, for 27 years, John McKay made his home with Mr. and Mrs. Ferguson and at one time borrowed $5,000 from Mr. Ferguson and gave his notes therefor. When Mr. Ferguson was laid low with cancer he executed his will and John McKay discovered and read it, found he was not made a beneficiary and then made claim to Mr. Ferguson for services in caring for him during his sickness, and demanded $10,000. Mr. Ferguson, by payment in cash and cancellation of the notes, paid John McKay

the $10,000.    Mrs. Ferguson learned of this and was very much displeased, so expressed herself and John McKay left the home of the Fergusons.

Mrs. Ferguson believed that some medicine she took by mistake some 40 years ago was the cause of many of her subsequent physical ailments. The conclusion may have been illogical, and refuted by physicians, but in no sense can it be imagined that the will was the offspring of such belief. Mrs. Ferguson was not required to make bequests to all of her relatives or have some good reason for not doing so. It is said she gave away old clothes and at Christmas time made a present of a dollar to one of the help. It has been remarked that: "A Scotsman is aye wise a-hent the hand." We cannot help but feel that her gifts would be no evidence to a Scotsman of want of mental capacity, and we are not inclined to consider such a want of liberality evidence of mental incapacity.

Contestants cite *In re Lewandowski's Estate*, 236 Mich. 136, as authority calling for submission of this case to the jury. That case is not in point for there the testimony of incapacity related to the very hour of the claimed execution of the will and raised an issue of fact.

Contestants were required to produce some evidence tending to show want of sufficient mental capacity by testatrix at the time she made the will and codicils. This was the ultimate fact asserted in the contest. To meet such burden the evidentiary facts should have a reasonable tendency to establish such ultimate fact. The evidence failed to present an issue of fact for the jury. Errors assigned on rulings excluding and admitting evidence present no reversible error.

The judgment is affirmed, with costs against contestants.

SHARPE, C. J., and BIRD, SNOW, STEERE, FELLOWS, CLARK, and McDONALD, JJ., concurred.