*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF AURELIA M. ROKOSKY.

---

KELLY DAILEY, Personal Representative of the
ESTATE OF AURELIA M. ROKOSKY,

        Petitioner-Appellee,

v

JOYCE M. THIERMAN,

        Respondent-Appellant.

UNPUBLISHED
August 19, 2021

No. 353403
Wayne Probate Court
LC No. 15-809781-DE

---

Before: CAVANAGH, P.J., MURRAY, C.J. and REDFORD, J.

PER CURIAM.

Respondent appeals as of right the probate court's opinion and order setting aside the April 16, 1976 will of decedent, Aurelia M. Rokosky, admitting decedent's January 24, 2011 will, and removing respondent as personal representative of decedent's estate. The court's order also named petitioner, Kelly Dailey, as successor personal representative. On appeal, respondent contends that the trial court clearly erred in its factual finding that decedent had testamentary capacity to execute the 2011 will, and the trial court's order setting aside the 1976 will and admitting the 2011 will should be reversed. We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Decedent executed a will on April 16, 1976, naming her daughter, respondent, as the sole beneficiary and personal representative. Decades later, and after the relationship between respondent and decedent evaporated, decedent called a local estate planning attorney, Guy Vining, who had done some work for her in the past, and told him she wanted to make a new will. Decedent clarified to Vining that she did not want to leave anything to family members, and her entire estate was to go to petitioner. Vining also recommended that she have prepared power of attorney and

-1-

patient advocate documents, and decedent had Vining draft those documents naming petitioner as power of attorney and patient advocate. Decedent signed the new documents on January 24, 2011, making petitioner the personal representative and sole heir under the new will.

Decedent died on August 14, 2013. Respondent learned of her mother's death on a genealogy website. On July 22, 2015, respondent filed an application for informal probate of decedent's estate and acceptance of appointment as personal representative under the 1976 will. On July 28, 2015, the probate court entered an order granting informal probate and naming respondent personal representative. On February 3, 2016, petitioner filed a petition to set aside the informal probate of the 1976 will and be named successor personal representative, arguing the 2011 will should be admitted and, under its terms, petitioner should be named successor personal representative. Respondent responded to the petition by arguing that the 2011 will was invalid because decedent lacked testamentary capacity due to her suffering from Alzheimer's disease or dementia. The response also argued that a life estate deed, or ladybird deed, which was executed by decedent on September 29, 2011 and granted rights of survivorship to petitioner, was invalid because she was not mentally competent to execute the deed. Respondent had also challenged the validity of the life estate deed in a separate quiet title action filed in Wayne Circuit Court. That case was consolidated with the instant case.

Respondent filed a motion for summary disposition in the probate court to set aside the 2011 will and life estate deed. Respondent's brief in support of the motion argued that the medical records and expert testimony establish decedent was suffering from some form of dementia at the time she executed the 2011 will and life estate deed, decedent therefore lacked the requisite mental capacity to execute those documents, and they should be set aside. Petitioner argued in her response brief that respondent had not overcome the presumption that decedent had the mental capacity to execute the documents. The brief further argued that there was plenty of testimonial evidence, mainly from the attorneys who executed the will and life estate deed, to at least create a question of fact over whether decedent had capacity to execute the documents.

The probate court entered an opinion and order granting the motion for summary disposition in part and denying it in part, admitting the 2011 will but invalidating the life estate deed. The court found that respondent's expert testimony of Dr. Phillip Dines, which relied only on medical records created after the execution of the 2011 will, failed to show that decedent was suffering from dementia to a level that affected her testamentary capacity in light of the other testimony regarding decedent's cognitive ability. More specifically, the court found respondent did not present evidence that the 2011 will was affected by respondent's forgetfulness or weakness. The affidavit of the attorney who drew the will, and the testimony of the neighbor, Scherer, who decedent called the night of executing the will, provided sufficient evidence that decedent had testamentary capacity when executing the 2011 will. As such, summary disposition in favor of petitioner was warranted and the 2011 will was admitted. However, the court held that decedent lacked the necessary capacity to execute the life estate deed. The court reasoned that, although the attorney who prepared the deed submitted an affidavit stating that he believed decedent had capacity, decedent's medical records beginning with her hospitalization through the execution of the deed, in addition to the fact that decedent did not arrange for the attorney's services, meant that decedent lacked capacity to execute the life estate deed.

Respondent appealed, and this Court reversed the granting of summary disposition in favor of petitioner. *In re Estate of Aurelia M. Rokosky*, unpublished per curiam opinion of the Court of Appeals, issued February 12, 2019 (Docket No. 341693), p 4. The Court reasoned that there was evidence from witness testimony that decedent was merely suffering from some forgetfulness and physical decline, consistent with old age, and decedent had testamentary capacity to execute the 2011 will. However, there was also evidence from the expert witness that, given decedent was hospitalized and diagnosed with dementia four days after executing the 2011 will, decedent lacked testamentary capacity from the time she executed the 2011 will through the end of her life. This Court held that the probate court impermissibly weighed the evidence when it found decedent had testamentary capacity to execute the 2011 will. As such, this Court reversed and remanded for further proceedings.

The case proceeded to a bench trial. On March 20, 2020, the probate court released an opinion and order, with extensive factual findings, holding that decedent had testamentary capacity when she executed the 2011 will. Based on these findings, the court admitted to probate the 2011 will, held the 1976 will shall not be reinstated, and named petitioner as successor personal representative.

## II. DISCUSSION

Respondent's sole contention on appeal is that the probate court clearly erred when it found decedent had testamentary capacity to execute the 2011 will.

This Court reviews for clear error the findings of a probate court sitting without a jury. *In re Estate of Bennett*, 255 Mich App 545, 549; 662 NW2d 772 (2003). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. "The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *In re Erickson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993).

The right to contest a will is statutory and the burden is on the will contestant to establish the will is void for lack of testamentary capacity. MCL 700.3407(1)(c). A testator's capacity to execute a will is presumed. *In re Mardigian Estate*, 312 Mich App 553, 565; 879 NW2d 313 (2015). "Whether a decedent had testamentary capacity is judged as of the time of the execution of the instrument, and not before or after, except as the condition before or after is competently related to the time of execution." *Id*. at 565-565 (quotation marks removed). Just because a testator lacked capacity before or after the execution of a will does not mean the testator lacked capacity at the time the will was executed. *Fish v Stilson*, 352 Mich 437, 440-441, 90 NW2d 509 (1958). To have testamentary capacity, a testator must "be able to comprehend the nature and extent of his property, to recall the natural objects of his bounty, and to determine and understand the disposition of property which he desires to make." *Persinger v Holst*, 248 Mich App 499, 504; 639 NW2d 594 (2001). Stated another way, a testator must know what property she owns, who her family is, and how the will disposes of the property in order to have testamentary capacity. Proof of old age, mental weakness, or forgetfulness are insufficient to establish a lack of testamentary capacity. *In re Sprenger's Estate*, 337 Mich 514, 521; 60 NW2d 436 (1953). Neither a "lack of wisdom in the

-3-

disposition of the property nor the fairness of the provisions of the will [should] influence the court in a determination of mental competency." *Id.* "A testator may be suffering physical ills and some degree of mental disease and still execute a valid will, unless the provisions thereof are affected thereby." *In re Ferguson's Estate*, 239 Mich 616, 627; 215 NW 51 (1927).

In arguing that decedent lacked testamentary capacity to execute the 2011 will, respondent relies heavily on Dr. Phillip Dines' expert testimony that decedent was likely suffering from dementia when she executed the 2011 will. However, the fact that a testator has dementia is not dispositive as to whether she had testamentary capacity when she executed a will. The appropriate test is whether, when signing the will, the decedent was "able to comprehend the nature and extent of his property, to recall the natural objects of his bounty, and to determine and understand the disposition of property which he desires to make." *Persinger*, 248 Mich App at 504. We do not find clear error in the probate court's finding that decedent had testamentary capacity when she executed the 2011 will.

Respondent does not specifically argue that decedent was incapable of comprehending the nature and extent of her property, and the record does not support the contention that decedent was unaware of the extent of her property. Decedent told her attorney Guy Vining, William Scherer, and petitioner that she desired to leave everything to petitioner. Scherer testified that when decedent told him she was leaving everything to petitioner, he understood that to mean she was leaving petitioner her house.[1] The parties do not suggest, nor is there any evidence, that decedent was no longer able to understand that she owned some asset that was not mentioned in the 2011 will. As such, it was not clear error for the court to conclude that decedent understood the extent of her property.

It was also not clearly erroneous for the court to find decedent could recall the natural objects of her bounty. The record does not indicate decedent forgot who her daughter was. It is true that decedent would refer to petitioner as her daughter, but petitioner did not believe decedent actually thought petitioner was her daughter. There was also the suggestion by Dr. Dines that decedent was starting to forget people who decedent knew. However, this was contradicted by the evidence that decedent did not recognize Julie Snyder when she knocked on decedent's door to check on her, but once Scherer called decedent and explained who Snyder was, decedent remembered her. Dr. Dines also opined that decedent was likely forgetting who Scherer was and becoming afraid of him, leading decedent to tell Scherer she did not need his help anymore. However, the evidence shows decedent was merely coordinating those who were helping her. She decided to hire a lawn service, so Scherer would not have to cut her grass anymore. And decedent asked petitioner to start helping with shopping and cleaning around the house. The fact that decedent asked Scherer to take her to a fast food restaurant one day a few months after she told him she did not need his help anymore shows decedent knew who Scherer was and was not afraid of him.

Further, decedent understood the difference between those who were family and those who were not when expressing her intentions for the 2011 will. She told her attorney that she wanted to exclude all family members from her will and devise her entire estate to petitioner. Vining

---

[1] The only asset discussed in the record is decedent's house.

testified that decedent was quite clear that she wanted to exclude any relatives from her will, revealing that decedent knew that she had living family members and purposefully excluded respondent and any others from taking under the 2011 will. Therefore, it was not clearly erroneous for the probate court to conclude decedent knew the natural objects of her bounty.

It was also not clearly erroneous for the probate court to find that, when signing the will, decedent could determine and understand the disposition of property which she was making under the will. Respondent contends that decedent's January 28, 2011 hospitalization and subsequent dementia diagnosis, four days after signing the will, shows that decedent could not have had testamentary capacity on January 24, 2011, when she signed the 2011 will. Respondent argues that the probate court impermissibly relied on the testimony of lay witnesses to the exclusion of the expert testimony about when decedent likely lost the capacity to execute a will. However, a closer look at the events leading up to and after the execution of the 2011 will shows significant evidence, apart from any expressed opinions about decedent's mental state, that decedent understood what she was doing in signing the will.

For example, decedent made an unsolicited call to Vining, who had done some work for her previously, and asked for a new will to be drawn. Vining testified that decedent knew exactly what she wanted done, and saw his role in the process as acting as a scrivener. The fact that the 2011 will revoked all prior wills shows that decedent likely knew she already had a will.

Additionally, when decedent signed the 2011 will on the evening of January 24, 2011, Vining came to her house for the signing and testified that decedent greeted him, knew who he was and why he was there, and was a gracious host. Vining, an experienced estate planning attorney, testified that nothing that evening led him to be concerned decedent lacked an understanding of what she was doing in signing the will. In Vining's opinion, decedent had testamentary capacity to execute the 2011 will. That night, decedent called Scherer six or seven times, repeating the same conversation, in which decedent told Scherer that she signed everything over to petitioner and they discussed the fact that a neighbor had died that day. This evidence suggests that decedent was having memory issues in the evening after she signed the 2011 will, but in each of the calls she did remember that she had executed a will devising her entire estate to petitioner.

Further, the day after the execution of the will, Vining dropped off copies of the documents and Vining testified that decedent once again greeted him, was fully aware of who he was and why he was there, and paid him for his services with a check. In between the execution of the will and decedent entering the hospital on January 28, 2011, while petitioner was at decedent's house, decedent gave her copies of the 2011 will, power of attorney, and patient advocate documents. And decedent explained to petitioner that the will was leaving to her decedent's entire estate, and the patient advocate documents empowered petitioner to make medical decisions for decedent. This shows that even after making all the calls to Scherer, decedent understood what it meant to sign the estate planning documents.

There is no real question that while decedent was admitted to the hospital with acute dehydration from January 28, 2011 to February 1, 2011, she would not have had testamentary capacity. Decedent did not know what month or year it was, how long she had been in the hospital, or why she was there. Decedent also believed she had been recently widowed, when in reality she

had been divorced for decades and her prior live-in companion had died around 1997. But Dr. Dines' expert testimony was that after decedent was rehydrated, her cognitive functioning would return to whatever level it was at prior to the dehydration. And that appeared to be the case. When Scherer visited decedent in the nursing home she was transferred to following the hospital stay, decedent again told Scherer that she had made a new will devising everything to petitioner. This provides evidence that once decedent's cognitive functions returned to their baseline from prior to the dehydration, she once again understood that she had executed a new will leaving her entire estate to petitioner. As such, the probate court's finding that decedent understood what she was doing in executing the will was not clearly erroneous. Likewise, the probate court's finding that decedent had testamentary capacity to execute the 2011 will was not clearly erroneous.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Christopher M. Murray
/s/ James Robert Redford