# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Estate of GERALD R. MAHONEY TRUST &
NANCY W. MAHONEY TRUST.

---

KIM JONES,

        Appellant,

v

KEITH MAHONEY and NANCY W.
MAHONEY as Co-Trustees of the Nancy W.
Mahoney Trust,

        Appellees.

UNPUBLISHED
August 20, 2015

No. 320074
Charlevoix Probate Court
LC No. 11-011713-TV

---

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Appellant Kim Jones appeals as of right from a judgment for appellees Keith Mahoney and Nancy Mahoney in this probate dispute involving the management of the trusts of Nancy Mahoney and her deceased spouse, Gerald. We affirm in part, reverse in part, and remand for proceedings not inconsistent with this opinion.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In 1996, Gerald and Nancy Mahoney executed separate revocable living trusts for their benefit and for the benefit of the couple's three children, Keith, Karen, and Kim. At the time the initial trusts were signed, Nancy and Gerald owned approximately 20 acres of lakefront land, with a house and a cottage, on the south arm of Lake Charlevoix. The trial court explained how the property, which stands at the forefront of this dispute, came into being:

> The Mahoney Family Property entered the family through Nancy's grandfather, Fred C. Pillsbury. Fred purchased a sizable parcel of real estate with more than a mile of frontage on Lake Charlevoix in 1916. Fred had three children; in birth order they were Howard, Edna and Raymond Pillsbury. When Fred passed on portions of the lakefront property to his children, he did so by dividing the property into multiple lakefront lots and afforded his children choice

-1-

of lots according to birth order. Thus, Fred allowed Howard to choose first, Edna second and Raymond last. This was the first time that the Pillsbury/Mahoney family passed this lakefront property in any form from one generation to the next.

Raymond Pillsbury and his wife, Marian - known within the Mahoney family as "Rayray" and "Mimi" -- had two children. June Pillsbury was the older sister, and Nancy the younger. Rayray and Mimi decided that the property Rayray inherited from his father would be divided along the lakefront into two parcels, with one parcel each to be given to June and Nancy and that their children would select which parcel each would receive according to birth order. As the elder child, June first selected one lot, leaving Nancy with the remaining lot. The lot received by Nancy constitutes the Mahoney Family Property that is central to this dispute. This was the second time that the Pillsbury/Mahoney family transferred the lakefront property from one generation to the next. In both instances, the property was first divided into multiple lakefront parcels, and then the members of the succeeding generation selected the parcel according to birth order, with the oldest selecting first and the youngest selecting last.

On December 12, 2003, Nancy and Gerald formed the Mahoney Family LLC, a Michigan limited liability company (the LLC), and executed an operating agreement. Gerald and Nancy were the initial members and managers, each holding a 50 percent interest in the LLC. The real property was transferred into the LLC. Beginning in 2003, Nancy and Gerald began to transfer interest in the LLC to each child, apparently in lieu of annual cash gifts, and each child eventually owned 5.1402 percent of the LLC's "ownership units."

On January 12, 2004, Nancy and Gerald executed amendments to their respective trusts. Gerald designated Nancy as his sole "Successor Trustee" and designated his children as "Successor Co-Trustees" to serve jointly if Nancy could or would not. Nancy's first amendment contained similar provisions, and also provided for the transfer of 30 percent of the assets of the trust to the LLC to maintain the cottages and property owned by the LLC.

Gerald died on June 25, 2007. At that time, the real property in the LLC was valued at $1.8 million. With the help of Keith and a family friend, Nancy chose attorney Andrew Shotwell to help her manage the LLC and Gerald's trust. According to Shotwell and Greg Sherman, an accountant assisting Shotwell, there was a risk that the IRS would disregard the gifts of LLC assets that Gerald and Nancy had made to the children. Both recommended to Nancy that she take the property out of the LLC and dissolve it.

Discussions occurred concerning returning the children's interests in the LLC and, in August of 2008, the children gave their membership interest in the LLC back to the LLC. At the same time, rather than having the real property remain one undivided parcel that the children would share, Nancy became interested in splitting the property and gifting lots to the children, with each child to pick by birth order a lakefront lot, and with one back lot remaining commonly owned. Although the parties disagree strongly about the involvement of Keith in Nancy's ultimate decision, and in Nancy's cognitive facilities during this time period, Nancy eventually arrived at a plan by which she would transfer the 50 percent interest in the LLC that currently was held by Gerald's trust into Nancy's trust; in return, Nancy executed a 30-year promissory

note, totaling $900,000, from her trust to Gerald's trust; she also executed mortgages for each of the lakefront lots but did not record them.

Along with these actions as trustee of Gerald's trust and as the manager of the LLC, Nancy also amended her trust twice more. On November 14, 2008, Nancy amended her trust to name Keith as her co-trustee, with Keith also named as successor trustee and Karen and Kim designated as respective successor trustees, with Karen to serve first. On February 5, 2010, Nancy executed a third revision to her trust, which Keith signed as co-trustee. The trust amended the successor trustee portion of the trust to list only Keith as successor trustee. This amendment also provided that the three lakefront lots were to be divided among Nancy's children, with the oldest child having first pick of the lots. In addition, following an appraisal the values of the lots were to be equalized so that the owners of the less expensive lots would be compensated "by payment of cash or other assets." The fourth lot, along with $75,000, would be held in the trust for the benefit of all of Nancy's children. The trust also contained a provision that each child would sign a right of first refusal agreement to offer to sell the child's lot to the others at a 50 percent discount.

Effective February 2, 2011, Nancy was adjudged incapable of managing her affairs by two physicians and her children became co-trustees of the trust. Kim filed an initial petition for accounting and other relief on December 7, 2011, and filed an amended petition on July 13, 2012, raising fourteen claims, including claims that Keith had unduly influenced Nancy, who had a lack of sufficient mental capacity to enter into her latter trust amendments, and a claim that Nancy had breached her fiduciary duty as trustee of Gerald's trust through self-dealing. Nancy, Keith, and Karen counterclaimed to enforce the incontestability clause in Nancy's trust.

A four-day bench trial was held in May and October, 2013. In an 83-page opinion, the trial court held: (1) Keith did not unduly influence Nancy, and Shotwell took measures to ensure that Nancy was free from undue influence; (2) Nancy had sufficient capacity to understand and carry out her estate plan; and (3) Nancy did not breach her fiduciary duties as trustee of Gerald's trust. The trial court further found that Kim lacked probable cause to challenge the second and the third revisions of Nancy's trust at the time of the filing of her petition and that the incontestability clause in Nancy's trust would therefore be enforced against Kim, who would then have no rights as a beneficiary under Nancy's trust. Kim now appeals as of right.

## II. STANDARD OF REVIEW

The standard of review on appeal in cases where a probate court sits without a jury is whether the court's findings are clearly erroneous. *In re Bennett Estate*, 255 Mich App 545, 549; 662 NW2d 772 (2003). "A finding is clearly erroneous when a reviewing court is left with a definite and firm convict ion that a mistake has been made, even if there is evidence to support the finding." *Id.* "[T]his Court reviews de novo the language used in wills and trusts as a question of law." *In re Reisman Estate*, 266 Mich App 522, 526; 702 NW2d 658 (2005).

## III. BREACH OF FIDUCIARY DUTY – NANCY

Kim first challenges the trial court's determination that Nancy did not violate her fiduciary duty as successor trustee of Gerald's trust when she devised individual lakefront lots

rather than leaving an undivided interest in the total lot. Kim claims that Nancy had a substantial conflict of interest and engaged in self-dealing when she transferred Gerald's trust's interest to her own trust in return for a $900,000, 30-year promissory note secured by mortgages for each of the lakefront lots. Kim maintains that the transaction was voidable pursuant to MCL 700.7802. We disagree.

That actions by a trustee which involve self-dealing are voidable under certain circumstances has long been recognized in Michigan. See, e.g., *Baxter v Union Indus Trust & Savings Bank*, 273 Mich 642, 646-647; 263 NW 762 (1935). Both parties cite MCL 700.7802 in support of their respective positions. This statute provides in pertinent part:

> (2) Subject to the rights of persons dealing with or assisting the trustee as provided in section [MCL 700.7912] a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a substantial conflict between the trustee's fiduciary and personal interests is voidable by a trust beneficiary affected by the transaction unless 1 or more of the following apply:

> (a) *The transaction was authorized by the terms of the trust.*

> (b) The transaction was approved by the court after notice to the interested persons.

> (c) The trust beneficiary did not commence a judicial proceeding within the time allowed by section 7905.2.

> (d) The trust beneficiary consented to the trustee's conduct, ratified the transact ion, or released the trustee in compliance with section 7909.3.

> (e) The transaction involves a contract entered into or claim acquired by the trustee before the person became or contemplated becoming trustee.

> (f) The transaction is otherwise permitted by statute.

> * * *

> (7) This section does not preclude the following transactions, *if fair to the trust beneficiaries*:

> * * *

> (c) *A transaction between a trust and another trust, decedent's estate, or conservatorship of which the trustee is a fiduciary or in which a trust beneficiary has an interest.* [Emphasis added.]

The trial court did not directly address this statutory provision, instead concluding that Kim "presented no evidence of harm to Gerald's Trust from this transaction, and to the contrary,

Gerald's Trust has increased in value as a result of the transaction." In so doing, the trial court concluded that the terms of the promissory note and mortgages were reasonable and fair. We agree. However, to the extent Kim declares that the transaction was nevertheless voidable under the statute, we conclude that decision was correct because Gerald's trust authorized the transaction and because the transaction was fair to Kim as a trust beneficiary.

Gerald's trust precluded Nancy or one of the successor trustee children from exercising any power "for his or her own direct or indirect benefit" unless he or she is "acting in concert with at least one other SUCCESSOR TRUSTEE who is an Independent Trustee or who qualifies as an 'adverse party' having a 'substantial interest' " in the action. The children were no longer "Independent Trustees" after Gerald amended his trust in 2004. Nevertheless, Keith acted "in concert" with Nancy even though only Nancy signed the documents transferring the LLC's interest to her trust in return for the promissory note and the mortgages. Although the phrase "in concert" is not defined in the trust, this Court has held, that in the context of a tort case, to prove that multiple defendants acted with concert-of-action or "in concert," a plaintiff must prove that "all defendants acted . . . pursuant to a common design." *Urbain v Beierling*, 301 Mich App 114, 132; 835 NW2d 455 (2013) (internal quotation marks and citation omitted).

At the time of Nancy's actions, Keith stood in the shoes of the other successor trustee children, each of whom had adverse interests to Nancy as the surviving spouse, given the fact that Gerald's estate would otherwise first be placed in the credit shelter trust up to the applicable exclusion amount prior to Nancy receiving any portion of it in the marital trust. In 2007, this amount was $2,000,000. Therefore, given the property valuation of $1.8 million, Nancy's ability to access Gerald's portion of the LLC was limited, and any amount she removed pursuant to the terms of the trust would be at the expense of her children's interests. Moreover, if any actual risk to Kim's interest in Gerald's trust could be said to exist as the result of the property transfer, Keith's risk of this portion of his presumed inheritance would have been identically affected. We thus find that Keith was an adverse party to Nancy and acted in concert with her to effectuate the property transfer from Gerald's trust. Gerald's trust authorized this action. Therefore, Kim's argument that Nancy violated MCL 700.7802(2) is without merit.

### IV. *IN TERROREM CLAUSE*

Kim next argues that the trial court erred when it found that the *in terrorem* clause had been triggered by Kim's challenges to the second and third amendments to Nancy's trust.

> In Michigan, *in terrorem* clauses [in trusts as well as wills] are generally valid and enforceable. *Schiffer v Brenton*, 247 Mich 512, 520; 226 NW 253 (1929); *In re Penny Trust*, 299 Mich App 525, 530; 831 NW2d 251 (2013). However, such clauses must be strictly construed by the courts. *Id.;* see also *Saier v Saier*, 366 Mich 515, 520; 115 NW2d 279 (1962). [*In re Stan Estate*, 301 Mich App 435, 443; 839 NW2d 498 (2013).]

See also *In re Miller Osborne Perry Trust*, 299 Mich App 525, 530; 831 NW2d 251 (2013). Another limitation is contained in MCL 700.7113, which provides: "A provision in a trust that purports to penalize an interested person for contesting the trust or instituting another proceeding

relating to the trust shall not be given effect if probable cause exists for instituting a proceeding contesting the trust or another proceeding relating to the trust."

This Court has held that "[p]robable cause exists when, at the time of instituting the proceeding, there was evidence that would lead a reasonable person, properly informed and advised, to conclude that there was a substantial likelihood that the challenge would be successful." *In re Stan Estate*, 301 Mich App at 445 (citation and internal quotation marks omitted). "[T]he issue whether probable cause existed necessarily turns on the evidence that the challenging party had at the time he or she instituted the challenge . . . ." *In re Miller Osborne Perry Trust*, 299 Mich App at 532 n 1. The "[w]ant of probable cause is a question of fact." *Rivers v Ex-Cell-O Corp*, 100 Mich App 824, 834; 300 NW2d 420 (1980).

Here, Nancy's initial trust contained the following incontestability clause:

[I]f any beneficiary hereunder asserts any claim whatsoever (except a legally enforceable debt), statutory election, or other right or interest against or in

GRANTOR'S estate, Grantor's Will, or any properties of this trust, other than pursuant to the express terms hereof or of said Will, or directly or indirectly contests, disputes, or call into question, before any tribunal, the validity of this instrument or of said Will or the validity of any provisions of this instrument or of said Will, then:

A. Such beneficiary shall thereby absolutely forfeit any and all beneficial interests of whatsoever kind and nature which such beneficiary might otherwise have under this instrument[.]

While Nancy's trust was subsequently amended, none of the amendments affected this clause.

## A. PROBABLE CAUSE FOR CLAIM OF BREACH OF FIDUCIARY DUTY -- NANCY

Kim maintains that she had probable cause to challenge the third amendment to Nancy's trust based on Nancy's breach of her fiduciary duties to Gerald's trust. We have already concluded that Nancy did not breach her fiduciary duty as successor trustee to Gerald's trust. Given that the language of the trust allowed such a transfer, there was not a substantial likelihood that this challenge would succeed when she filed her petition.

## B. PROBABLE CAUSE FOR CLAIM OF LACK OF CAPACITY

Kim argues that the trial court erred when it determined that she did not have probable cause to base her challenges to Nancy's second and third trust amendments based on her lack of capacity. Kim does not challenge the trial court's ultimate finding that Nancy did have the capacity to understand her estate planning, but argues, based on what she observed during the time period, that she had probable cause to find that such a claim would likely succeed.

Pursuant to MCL 700.7601, "[t]he capacity required to create, amend, revoke, or add property to a revocable trust, or to direct the actions of the trustee of a revocable trust, is the same as that required to make a will." MCL 700.2501 provides as follows:

(1) An individual 18 years of age or older who has sufficient mental capacity may make a will.

(2) An individual has sufficient mental capacity to make a will if all of the following requirements are met:

(a) The individual has the ability to understand that he or she is providing for the disposition of his or her property after death.

(b) The individual has the ability to know the nature and extent of his or her property.

(c) The individual knows the natural objects of his or her bounty.

(d) The individual has the ability to understand in a reasonable manner the general nature and effect of his or her act in signing the will.

To have testamentary capacity, a testator must " 'be able to comprehend the nature and extent of his property, to recall the natural objects of his bounty, and to determine and understand the disposition of property which he desires to make.' " *Persinger v Holst*, 248 Mich App 499, 504; 639 NW2d 594 (2001) (citations omitted). A testator must know what property is owned and to whom he wishes to give the property, as well as how that will be accomplished. *Id.* It is presumed that a testator has such capacity. *In re Powers Estate*, 375 Mich 150, 158; 134 NW2d 148 (1965). Testamentary capacity is judged at the time the will is executed, unless the testator's condition prior or subsequent to the execution is related to the time of execution. *Id.* "Weakness of mind and forgetfulness are insufficient to invalidate a will if it appears that the mind of the testator was capable of attention and exertion when aroused and he was not imposed upon." *In re Paquin's Estate*, 328 Mich 293, 302; 43 NW2d 858 (1950). Simply put,

> If [the testator] at the time [he] executed the will, had sufficient mental capacity to understand the business in which [he] was engaged, to know and understand the extent and value of [his] property, and how [he] wanted to dispose of it, and to keep these facts in [his] mind long enough to dictate [his] will without prompting from others, [he] had sufficient capacity to make the will. A testator may be suffering physical ills and some degree of mental disease and still execute a valid will, unless provisions thereof are affected thereby. *[In re Ferguson's Estate*, 239 Mich 616, 627; 215 NW 51 (1927) (alterations added).]

As discussed in the trial court's findings, our Supreme Court and this Court have repeatedly upheld the validity of the estate documents of those whose sanity or mental capacity might be regarded as questionable. See, e.g., *Fish v Stilson*, 352 Mich 437, 440-442; 90 NW2d 509 (1958); *In re Nickel's Estate*, 321 Mich 519, 524-525; 32 NW2d 733 (1948). Here, the listed examples cited by *Kim* included general forgetfulness, requiring assistance with banking and other financial needs, and some mild dementia. However, "[w]eakness of mind and forgetfulness are . . . insufficient of themselves to invalidate a will." *In re Sprenger's Estate*, 337 Mich at 521. For example, telling to the trial court was the fact that, while Nancy had trouble filling out checks for Christmas gifts in 2009, she still knew to whom she wanted to give the gifts. We agree with the trial court's analysis.

-7-

In addition, appellant admits that she wrote a note to Karen and Keith in July 2009, stating that although Nancy's ability to live independently should be questioned in the future, she was not yet at that point. While, by itself, *this* letter cannot prove Nancy's competence or lack thereof, the fact remains that at that point, appellant believed Nancy to have the ability to manage most, if not all, of her own affairs.

To the extent appellant's arguments could be said to apply to the contract she executed between Gerald's and Nancy's trusts, in *In re Erickson Estate*, 202 Mich App 329, 332; 508 NW2d 181 (1993), this Court set forth a substantially similar test for the mental capacity to contract:

> The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which the person is engaged. To avoid a contract it must appear not only that the person was of unsound mind or insane when it was made, but that the unsoundness or insanity was of such a character that the person had no reasonable perception of the nature or terms of the contract. [Citations omitted.]

In addition, although Nancy was ultimately deemed incapable of managing her own affairs in 2011, the trial court was well within its discretion to find this of little probative value as to Nancy's mental capacity years earlier. *In re Powers Estate*, 375 Mich at 158; see also *In re Nickel's Estate*, 321 Mich at 524 (instructing that because the sole question under consideration is the mental competence of the testator at the time the will was executed, "[t]he admissibility of testimony regarding subsequent events is solely within the discretion of the trial court").[1]

### C. PROBABLE CAUSE FOR CLAIM OF UNDUE INFLUENCE

Kim also argues that the trial court erred when it failed to determine that she had probable cause to challenge the trust on the ground that Nancy executed the documents while she was under the undue influence of Keith. As with the lack of capacity challenge, Kim does not challenge the trial court's finding that Nancy was not under Keith's influence. She also does not challenge the trial court's determination that a presumption of undue influence did not attach based on the facts known *after* trial. She instead argues that, from the information she knew at the time she filed her petition, she had probable cause to believe this to be the case. As Kim points out, while the trial court, after its review of the evidence, found that no presumption of undue influence attached, it did not reach the ultimate issue of whether Kim nevertheless had probable cause to challenge the trusts on this ground based on the information she had at the time she filed her petition. We find that the trial court erred in its conclusion concerning the presumption and further find that probable cause to raise the challenge was shown.

---

[1] We further note that Kim's arguments here are at odds with her complaint that the trial court should have found that Nancy deliberately abandoned her fiduciary duty to arrive at a plan where she would benefit at the expense of her children, because such would certainly require competence sufficient to execute a valid trust amendment.

> To establish undue influence it must be shown that the granter was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency, and impel the granter to act against the grantor's inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, is not sufficient.
>
> A presumption of undue influence arises upon the introduction of evidence that would establish (1) the existence of a confidential or fiduciary relationship between the granter and a fiduciary, (2) the fiduciary, or an interest represented by the fiduciary, benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor 's decision in that transaction. *[In re Erickson Estate*, 202 Mich App at 331 (citations omitted).]*

In addition, "[t]he benefit must arise from the specific transaction claimed to have been the subject of undue influence." *Id.* at 332.

The facts in this case support a finding that Keith and Nancy were in a fiduciary relationship, i.e., one "founded on trust and confidence by one person in the integrity and fidelity of another." *In re Leone Estate*, 168 Mich App 321, 325; 423 NW2d 652 (1988), citing *In re Wood Estate*, 374 Mich 278, 282; 132 NW2d 35 (1965). Although the parties agree that Nancy met with her attorney separately and that he took great pains to ensure Nancy was not under Keith's influence, appellees acknowledge that when Kim and Karen asked Nancy what was occurring, Nancy turned to Keith to explain it to them and Keith was also the one upon whom Nancy relied to help her arrange a meeting with an attorney to deal with the settling of Gerald's affairs. And, Nancy and Keith met with Shotwell on July 12, 2007, at which time Nancy retained him to deal with the preparation of the estate tax return and other matters relating to the administration of Gerald's estate. Shotwell testified that Nancy directed him to communicate with her through Keith. In addition, evidence was presented that, although still competent, Nancy was suffering from cognitive difficulties, which could place her in a "relationship of inequality" with Keith. See *In re Karmey Estate*, 468 Mich 68, 74 n 3; 658 NW2d 796 (2003).

Appellees point to *Hanson v McNamara*, unpublished opinion per curiam of the Court of Appeals, issued January 27, 2011 (Docket No. 293012),[2] to claim that "it is the law in Michigan that a person's mere involvement in meetings where a decedent's planning is discussed does not establish undue influence." However, appellees completely ignore the fact that the *Hanson* panel found that the respondents had established the *presumption* of undue influence where the petitioner had initially contacted an elder law clinic on the testators behalf, participated in many of the clinic's meetings, and drove the testator to the clinic's office the day the testator executed his will. *Id.*, unpub op p 4. We thus find that sufficient evidence was presented of this prerequisite to find a presumption of undue influence at least sufficient to meet the standard of probable cause to challenge the trusts.

---

[2] "An unpublished opinion is not precedentially binding under the rule of stare decisis." MCR 7.215(C)(1).

As to the second requirement, "the fiduciary, or an interest represented by the fiduciary, benefits from a transaction" (*In re Estate of Erickson*, 202 Mich App at 331), Kim pointed out that not only did Keith become the co-trustee of Nancy's Trust with Nancy and sole successor trustee, allowing him much more freedom in administering the Trust, he could take "total control of the distribution process." Part of this taking control was that he was now able to have his pick of lakefront lots. While the trial court did not find this to be a benefit because Nancy's estate plan called for an equalization of any monetary difference between the various lots distributed to her children via cash payment, real property is unique. See *In re Smith Trust*, 480 Mich 19, 27; 745 NW2d 754 (2008). In this case, one lot is a two-acre lot with a home and a pole barn while the other lots are one acre in size, one of which contains a cottage. It could be said, then, that Keith gained a benefit here, and Kim presented a colorable claim that she had probable cause to argue that this prerequisite had been met.

As to the third requirement, that "the fiduciary had an opportunity to influence the grantor's decision in that transaction" (*In re Estate of Erickson*, 202 Mich App at 331), the evidence presented led the trial court to find that this had not occurred, due to Shotwell's involvement and his steps to ensure that Keith did not have an opportunity to influence her. Kim, however, maintained that she had probable cause to believe that this element was satisfied because through her correspondence with her brother, she knew that Keith had multiple conversations with Nancy about her estate plans. While Kim also acknowledges that she knew that Shotwell had been retained as Nancy's attorney, she claims she could not have known that Keith was separated from Nancy at the time she signed the real estate documents when appellant filed her petition. This is a reasonable claim.

Evidence was presented to support the fact that Keith was at least involved in the decisions as an advisor to Nancy. And, appellees do not really contest that Keith assisted Nancy in carrying out her plan. Rather, they rely on the trial court's findings that the trial court properly found, *after* reviewing all of the evidence, that Keith did not have an opportunity to influence Nancy's decision. However, even the trial court found that Keith had acted in a "ministerial" role. Given the evidence presented, Kim possessed sufficient facts at the time of filing her petition to allow a reasonable person to find that there was a substantial likelihood that the undue influence challenge would be successful because Kim could present evidence to support a presumption of undue influence. At the time of her petition, Kim would not have been able to know whether such a presumption could be rebutted. We thus find that the presumption of undue influence attached and that there was sufficient evidence that Kim (and any reasonable person), at the time she filed her petition, could find that there was a substantial likelihood that the undue influence challenge would be successful.

While Kim has not shown that she had probable cause to challenge Nancy's trust amendments on the grounds of lack of capacity or breach of fiduciary duty, she raises a colorable claim that she had probable cause to challenge the amendments due to undue influence. MCL 700.7113 provides:

> A provision in a trust that purports to penalize an interested person for contesting the trust or instituting another proceeding relating to the trust shall not be given effect if probable cause exists for instituting a proceeding contesting the trust or another proceeding relating to the trust.

Under the plain language of the above statute, the use of a no-contest provision is foreclosed if an interested person raises a single reasonable objection to the trust or proceedings as a whole. Thus, as long as Kim had probable cause to raise even one of her challenges, the *in terrorem* clause in Nancy Mahoney's trust is inapplicable. Because of our conclusion that Kim had probable cause to challenge the amendments due to undue influence, the *in terrorem* clause in Nancy Mahoney's trust was unenforceable as to Kim.

Affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto